DENVER POST CORP., a Colorado corporation, d/b/a The Denver Post;  and Karen Crummy, Plaintiffs–Appellants,

v.

Bill RITTER, Governor of the State of Colorado, Defendant–Appellee.

No. 08CA2659.

Colorado Court of Appeals,
Div. A.

Dec. 24, 2009.

Levine Sullivan Koch & Schulz, L.L.P., Thomas B. Kelley, Steven D. Zansberg, Christopher P. Beall, Denver, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Denver, Colorado, for Defendant–Appellee.

Opinion by Chief Judge DAVIDSON.

The issue presented in this appeal is whether the personal cell phone billing statements of defendant, Governor Bill Ritter, constitute public records subject to disclosure under the Colorado Open Records Act (CORA), sections 24–72–201 to –206, C.R.S. 2009. We affirm the judgment dismissing the action to access the bills pursuant to CORA.

The following facts have been stipulated to or are not disputed: Ritter has both an official cell phone (a smartphone), for which the state pays and which Ritter uses almost exclusively for e-mail, and a personal cell phone, for which Ritter pays and which he uses for both official and personal telephone calls. The personal phone is not owned by and was not issued by the state, and the state neither pays for the phone nor reimburses Ritter for charges associated with its use. Substantially all the cell phone calls in which Ritter conducts state business are made or received on his personal phone. The majority of calls made or received on Ritter's personal phone during regular business hours are calls in which he discusses official business in his capacity as governor.

When Ritter makes or receives a call on his personal phone, the service provider automatically logs the date, time, and duration of the call and the telephone number of the other party. The service provider sends Ritter monthly billing statements that include this information. Ritter has not used the bills for any purpose other than to determine the amount owed and has not provided them to any other state officer or employee for any purpose.

Plaintiffs, Karen Crummy and her employer, Denver Post Corp., doing business as *The Denver Post* (collectively, the *Post*), requested access to the bills pursuant to CORA. The governor's office provided the records from the state-paid cell phone, but refused to provide the records from the personally-paid cell phone, stating that the personal cell phone bills were not public records subject to CORA. The *Post* then filed this action.

On Ritter's motion to dismiss for failure to state a claim under C.R.C.P. 12(b)(5), the

trial court determined that the *Post* had not shown that the requested documents were likely public records, denied the *Post's* motion to amend its complaint, and dismissed the case. The *Post* appeals, and on grounds different from those relied on by the trial court, we affirm.

## I. Standard of Review

### A. Trial Court Standard of Review

The dismissal of a complaint under C.R.C.P. 12(b)(5) is proper if, accepting all allegations of the complaint as true, it appears beyond a doubt that the plaintiff is not entitled to relief as a matter of law. *See, e.g., Public Service Co. v. Van Wyk*, 27 P.3d 377, 385–86 (Colo.2001). In its order, the trial court correctly examined the allegations of the complaint in the light most favorable to the *Post,* and, in concluding that the requested bills were not likely public records as a matter of law, assumed all of the *Post's* factual allegations were true.

■ Contrary to Ritter's suggestion, we do not agree that the trial court's consideration of the parties' stipulation of facts converted the Rule 12(b)(5) motion to a motion for summary judgment under C.R.C.P. 56. *See* C.R.C.P. 12(c); *Walker v. Van Laningham*, 148 P.3d 391, 397 (Colo.App.2006) (a court may consider facts of which it may take judicial notice without converting a motion to dismiss into one for summary judgment); *see also Kendall v. San Juan Silver Mining Co.*, 9 Colo. 349, 354, 12 P. 198, 200 (1886) (court must take judicial notice of stipulations of fact).

### B. Standard of Review on Appeal

We review de novo the dismissal of a complaint for failure to state a claim under C.R.C.P. 12(b)(5). Like the trial court, we accept the *Post's* factual allegations as true and construe them in the light most favorable to the *Post. See Asphalt Specialties, Co. v. City of Commerce City*, 218 P.3d 741, 744 (Colo.App.2009); *Kreft v. Adolph Coors Co.*, 170 P.3d 854, 857 (Colo.App.2007).

## II. Legal Framework: Shifting Burdens of Proof

### A. CORA

Subject to exceptions not relevant here, CORA requires that all public records be open for inspection. § 24–72–201, C.R.S.2009. CORA defines a "public record" as "all writings made, maintained, or kept" by the state "for use in the exercise of functions required or authorized by law" or involving public funds. § 24–72–202(6)(a)(I), C.R.S.2009.

■ By its terms, CORA balances the public's interest in access to information about how its government operates against the privacy interests of public officials and employees. *See Denver Publ'g Co. v. Bd. of County Comm'rs*, 121 P.3d 190, 194 (Colo. 2005) (citing legislative declaration of intent for 1996 amendments to CORA, which addressed e-mail). Consequently, although the statute generally favors access, CORA does not require public disclosure of all documents in the custody of state employees or agencies. *See* § 24–72–201, C.R.S.2009 (declaring legislature's intent to make all "public records" available for inspection). Thus, in CORA, both the definition of "public records" and the enumerated exceptions limit which documents are required to be disclosed. See *Denver Publ'g Co.*, 121 P.3d at 194 (recognizing "the privacy protection already integrated into CORA's express statutory provisions").

However, because the balancing of competing public and private interests is resolved differently in other contexts, documents not subject to disclosure under CORA may still be discoverable under other legal mechanisms. *See, e.g.,* Colo. Const. art. 2, § 7 (seizure of private document pursuant to a search warrant); §§ 24–72–301 to –309, C.R.S.2009 (Colorado Criminal Justice Records Act (CCJRA), providing for access to criminal justice records); C.R.C.P. 26(b)(1), 34(a)(1) (civil discovery); *see also Harris v. Denver Post Corp.*, 123 P.3d 1166 (Colo.2005) (records not subject to CORA were subject to disclosure pursuant to CCJRA).

### B. *Wick*

The parties agree, as do we, that our initial analysis is governed by *Wick Communications Co. v. Montrose County Board of County Commissioners*, 81 P.3d 360 (Colo. 2003).

According to *Wick*, when it is disputed whether a requested record is private or public, the court must determine as a threshold matter whether the requested records are likely public records as defined by CORA. When the custodian is a government agency, the burden of proving that a record is not public is on that agency because it holds the necessary information. *Id.* at 363–64.

■ However, when, as here, the custodian is not an agency but an individual with both private and official capacities, and it is disputed in which capacity he or she holds the record, the burden of showing that the record is likely a public record as defined by CORA is placed on the requesting party. To meet that initial burden, the requesting party must show that the record was likely "made, maintained, or kept" by the custodian in his or her official capacity. *Id.*

### C. *Denver Publishing Co.*

■ Only when the requesting party makes the required threshold showing that the records are made, maintained, or kept by the custodian in his or her official capacity does the burden shift to the custodian to show that the records were not "for use in the exercise of functions … authorized by law." *Denver Publ'g Co.*, 121 P.3d at 199; *see* § 24–72–202(6)(a)(I). Thus, it is only at this point that the court is to examine whether the contents of the records "address the performance of public functions," that is, whether the records are being held for use in the exercise of public functions. *Denver Publ'g Co.*, 121 P.3d at 199 (citing *Wick*, 81 P.3d at 366).

### III. Because the *Post* did not meet its burden, dismissal was proper

Accordingly, under *Wick*, the *Post* had the initial burden to show that the bills were likely "made, maintained, or kept" by Ritter in his official capacity as governor. 81 P.3d at 364. Because we conclude that the *Post* did not meet its required burden, we further conclude that the trial court properly dismissed the complaint.

### A. The trial court misapplied the *Wick* burden of proof

■ Initially, we agree with the *Post's* contention that, in its ruling, the trial court improperly placed on the *Post* the burden of showing the bills were likely public records by requiring it to show not only that the bills were likely made, maintained, or kept by the governor but also that they were "for official use."

In its order, the court found that under the facts of the complaint, taken as true and viewed most favorably to the *Post*, Ritter "maintained or kept" the bills. However, the court did not determine, as required by *Wick*, in what capacity Ritter did so. Instead, it analyzed whether the billing records were kept "for official use" under the test set forth in *Denver Publishing Co.*

In its analysis, the court determined that, pursuant to *Denver Publishing Co.*, although no allegation of actual official use was required, the *Post* was required to allege a likely future official use. The court agreed that the bills were connected with official business because Ritter used the cell phone for official calls, but it concluded that the complaint had not sufficiently alleged facts to show that the bills themselves were kept for official use.

To the extent that the court's analysis placed the burden on the *Post* to show that the bills were being kept "for official use," we agree with the *Post* that the court erred. *See Denver Publ'g Co.*, 121 P.3d at 199 (a requesting party that shows "the records are made, maintained, or kept in an official capacity" has met its burden and "the burden then shifts to the public agency").

### B. The *Post* did not meet the threshold burden required by *Wick*

■ However, under the *Wick* analysis, before the burden shifted to Ritter to show that the bills were being kept for "official

use," it was the *Post's* burden to show that Ritter likely made, maintained, or kept the bills in his official capacity as governor. *See Wick*, 81 P.3d at 364. Because we conclude that the *Post* did not allege facts that, viewed most favorably to it and accepted as true, showed that Ritter likely "made, maintained, or kept" the bills in his official capacity, we agree that the trial court's dismissal of the complaint was proper, albeit on somewhat different grounds. *See Camp Bird Colorado, Inc. v. Bd. of County Comm'rs*, 215 P.3d 1277, 1280 (Colo.App.2009) (affirming on grounds different from those relied on by the trial court); *Roth v. Capitol Life Ins. Co.*, 36 Colo.App. 46, 538 P.2d 125 (1975) (court's error in stating burden of proof was on insurer to prove suicide rather than beneficiary to prove accident was harmless where it otherwise employed the correct analysis), *rev'd on other grounds*, 191 Colo. 289, 553 P.2d 390 (1976). In analyzing whether the *Post* met its threshold burden, because they are not contradictory, we accept as true the allegations of both the original and the proposed amended complaint, and we take judicial notice of the stipulation of facts.

### 1. Ritter did not "make" the bills

First, the *Post's* factual allegations were insufficient to show that Ritter "made" the bills, in either his personal or his official capacity. To "make" something in the context of making a record means to create, or generate it. *Webster's Third New International Dictionary* 945; *see Hiwan Homeowners Ass'n v. Knotts*, 215 P.3d 1271, 1273 (Colo.App.2009) (appellate courts may determine meaning of undefined statutory words by referring to a dictionary). Here, the undisputed fact is that the service provider created and generated the phone bills.

The *Post* does not dispute that the bills came from the service provider. It contends, nonetheless, that because placing or receiving calls is a necessary prerequisite to the creation of each line item on the bills, Ritter also "made" the bills (and, because the majority of Ritter's calls concerned official business, he did so in his official capacity).

However, although we agree with the *Post* that Ritter's phone calls triggered each line item in the bills, we disagree that either version of the complaint contains factual allegations that show that Ritter created or generated the bills. Nor could they—it is indisputably the service provider that decides whether to list calls in its bills. The decision whether or not to toll calls is a business decision made by the service provider that is out of the control of both the maker and the receiver of calls.

Although we note that federal regulations require carriers that "offer or bill toll telephone service" to retain the line-item call information for eighteen months, it is the carrier's decision, not the customer's, whether or not to offer a tolled service instead of only offering a flat rate for unlimited calling. *See* 47 C.F.R. § 42.6 (2009). In contrast, we note that providers of land line telephones typically toll only long distance calls, and only to the originator; lists of local calls and received calls (where the charges were not reversed) are typically not included in billing statements.

Thus, we agree with Ritter that his participation in making the *calls*—even when the conversations concerned official business, and accepting that he was aware that the calls would be tolled by the service provider—does not constitute his making the *record that the calls were made.* We agree that Ritter (and the recipients of the calls) created the contents of the conversations—and Ritter would be the maker of a record of their contents just as someone could "make" a record by dictating to another for transcription or recording. However, the *Post* has not requested transcripts or recordings of the contents of the conversations pursuant to section 24–72–202(6)(a)(II), C.R.S.2009 (concerning "correspondence" of "elected officials"), presumably because none exist. Instead, it has requested the records that memorialize the fact that the conversations occurred, which are created and generated only by the service provider. Indeed, the service provider would still send a bill regardless of whether Ritter placed or received any calls; its contents would just be different.

### 2. Ritter did not "maintain" the bills

Ritter also did not "maintain" the bills in either his personal or his official capacity.

To maintain means to keep in good repair. *See Webster's Third New International Dictionary* 1362. Thus, in the context of a document, to "maintain" could include, for example, periodically updating the information contained in the document to maintain its accuracy. Although in some contexts "to maintain" can mean merely to keep, *see id.*, because the statute also includes the verb "kept," defining it as such here would make that word redundant. *See Johnston v. City Council*, 177 Colo. 223, 228, 493 P.2d 651, 654 (1972) (it is a fundamental rule of construction to give effect to every word of a statute if possible); *Hiwan*, 215 P.3d at 1273 (the meaning of a word may be ascertained by reference to the meaning of words associated with it).

Here, the extent of the allegations on this issue were that Ritter received the phone bills from the service provider, used them to pay the amounts owed, and has access to all of them from the service provider upon request. Thus, insofar as the term "maintain," as opposed to the term "keep," means to keep up or keep in good repair, there were no factual allegations whatsoever that Ritter maintained the bills.

### 3. Ritter "kept" the bills, but only in his personal capacity

We agree, as the trial court determined and Ritter does not dispute, that the *Post's* factual allegations showed that Ritter "kept" the bills. Thus, the issue we next address, pursuant to *Wick*, is in what capacity, personal or official, he did so. As noted, it was stipulated that Ritter has kept the bills only to verify the amounts he owed and to pay them, which is a personal, not official, function. The *Post* argues, however, that because the information contained in the bills could be used to confirm if and when particular calls were made, Ritter kept them in his official capacity. We disagree.

Although it definitively stated that "CORA was not intended to cover information held by a government official in his private capacity," the court in *Wick* did not provide a definitive test, or an exhaustive list of factors to consider, to determine in what capacity an official keeps a document. 81 P.3d at 364.

However, in determining that the public official's diary at issue in that case was not a public record, the court examined (1) whether the official was required to keep the diary; (2) where it was kept; (3) who had access to it; (4) whether a public entity had ever attempted to exercise control over it; and (5) to what use it was put. *Id.* at 364–66.

Informed by *Wick*, we apply a similar inquiry here. We conclude that the *Post's* factual allegations, viewed in the most favorable light and taken as true, do not show that Ritter kept the bills in his official capacity as governor. No official duties require a governor to keep personal cell phone bills. Indeed, although it may be impractical, a governor is not required to use a cellular telephone at all. Further, although where records are physically located is not dispositive of whether they are otherwise public, *see, e.g., Int'l Bhd. of Elec. Workers Local 38 v. Denver Metro. Major League Baseball Stadium Dist.*, 880 P.2d 160, 164 (Colo.App. 1994) (CORA does not require a custodian who is responsible for maintaining and keeping records to have the records in his actual physical possession), it is relevant that Ritter does not keep the bills at his office.

More important, none of Ritter's staff has ever had or been offered access to the bills, and no public official, employee, or agency, including the governor's office itself, has ever attempted to exercise control over them. *See id.* (the dispositive question is control and responsibility, not physical possession). Also, as noted, it is undisputed that the use to which Ritter has put the bills has been, as with any personal bill or invoice, to verify the amount owed and pay it, a use that is clearly personal, not official.

We do not disagree with the *Post's* assertion that the bills contain call logs, which can and have been used to corroborate or contradict someone's account of events. *See, e.g., People v. Gilbert*, 173 P.3d 1113, 1116 (Colo. O.P.D.J.2007) (using cell phone records showing that magistrate made ex parte phone calls to litigant as basis for censure). We disagree, however, that merely because the bills *could* be used to verify Ritter's call history, a use that could in certain circumstances be official, that speculation alone transforms them into public records under CORA.

██ The inherent function of any bill, such as the cell phone billing statements here, is for the provider of services or goods to obtain payment, *see Black's Law Dictionary* 846 (8th ed.2004) (an invoice is a list of goods or services furnished by seller to buyer, specifying price or terms of sale), and, as noted, the payment of a private bill, such as here, is an inherently private function. Indeed, if the possibility of some future official use could transform an otherwise private document, such as a personal bill, into a public record merely because it is kept by a public official or employee, then almost any document kept by a public official or employee could be subject to CORA's disclosure requirements. CORA does not reach so far. As the supreme court, in discussing *Wick*, stated, "simply because a document was 'made' [and we would include here, 'kept'] during one's tenure as a public official does not render it a public record." *Denver Pub'g Co.*, 121 P.3d at 195–96 (quoting *Wick*, 81 P.3d at 365).

Accordingly, we conclude that an alleged potential future official use, in the absence of *any* other indicia that a record is made, maintained, or kept in an official capacity, is not sufficient to establish that a record is likely a public record. Indeed, we note that in *Wick* there was more than a potential future use: there, the public official had actually used the requested diary to refresh his recollection of events leading to the termination of an employee and had quoted portions of it in an official report. Nonetheless, the court held that the diary in question was made, maintained, and kept in a personal, not an official, capacity. *Wick*, 81 P.3d at 360.

### C. Conclusion

Thus, although the trial court erred by assigning to the *Post* the burden of proof in the "for use" test articulated in *Denver Publishing Co.*, instead of addressing whether Ritter kept the bills in his official capacity as governor, it reached the correct result. Ritter kept the bills, but he did not do so in his official capacity, and thus, the trial court was correct in its determination that the *Post* did not meet its threshold burden of proof. Accordingly, the trial court properly dismissed the case.

### IV. Amended Complaint

As noted above, in our analysis of whether dismissal of the complaint was proper, we have accepted as true and viewed most favorably to the *Post* the allegations of both the original and the proposed amended complaint. Because, even with consideration of the allegations of the proposed amended complaint, we have determined that the *Post* failed to meet its threshold burden, we conclude, the *Post's* argument to the contrary notwithstanding, that the trial court correctly denied the request to amend the complaint on the ground that doing so would be futile. *See Bristol Co. v. Osman*, 190 P.3d 752, 759 (Colo.App.2007) (a court may properly deny leave to amend when the proposed amendment would be futile) (citing *Benton v. Adams*, 56 P.3d 81, 85 (Colo.2002)).

Accordingly, the judgment of dismissal is affirmed.

Judge STERNBERG * and Judge NIETO * concur.