DENVER POST CORPORATION, a Colorado corporation, d/b/a The Denver Post, and Karen Crummy, a Colorado citizen, Petitioners

v.

Bill RITTER, Governor of the State of Colorado, Respondent.

No. 10SC94.

Supreme Court of Colorado, En Banc.

June 20, 2011.

Levine Sullivan Koch & Schulz, L.L.P., Thomas B. Kelley, Steven D. Zansberg,

Christopher P. Beall, Denver, Colorado, Attorneys for Petitioners.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, Denver, Colorado, Attorneys for Respondent.

Baker & Hostetler L.L.P., Marc D. Flink, Denver, Colorado, Attorneys for Amici Curiae The Reporters Committee for Freedom of the Press, The American Society of News Editors, The Associated Press, The Association of Capitol Reporters and Editors, The Colorado Freedom of Information Council, The Colorado Press Association, The E.W. Scripps Company, Gannett Co., Inc.; Newspaper Association of America; The Radio Television Digital News Association; The Society of Professional Journalists.

Rachel L. Allen, Denver, Colorado, Attorneys for Amicus Curiae Colorado Municipal League.

Justice HOBBS delivered the Opinion of the Court.

In *Denver Post Corp. v. Ritter*, 230 P.3d 1238 (Colo.App.2009), the court of appeals concluded that cell phone bills for calls Governor Bill Ritter ("the Governor") made on his personal cell phone were not public records subject to disclosure under the Colorado Open Records Act ("CORA"). §§ 24–72–201 to –206, C.R.S. (2010). We granted certiorari, and affirm.[1]

Petitioners, journalist Karen Crummy and her employer Denver Post Corporation (collectively referred to as "the Post"), in 2008 requested access to the Governor's cell phone bills. In response to this request, the Governor provided cell phone bills from his state-paid Blackberry device. The Governor also owned a personal cell phone that he predominantly used throughout the week to make and receive calls. He personally paid all the bills for this cell phone. He refused to provide access to the bills the carrier prepared for this phone, claiming that these bills are not public records subject to disclosure under CORA.

The requested phone bills include approximately 10,000 phone calls. They list the date, time, telephone number, rate, minutes of duration of the call, city and state where the call originated and of the number called, and the airtime and long distance charges if any. The bills do not contain any content of messages, nor do they identify the names of persons the Governor called or the names of those who called him.

The district court granted the Governor's motion to dismiss the Post's complaint for failure to state a claim, pursuant to C.R.C.P. 12(b)(5), concluding that the Governor's personal cell phone bills were not likely public records subject to disclosure under CORA. The court of appeals affirmed the district court's judgment. *Ritter*, 230 P.3d at 1244. We agree.

CORA defines "public records" as

> all *writings made, maintained, or kept by the state,* any agency, institution, ... or political subdivision of the state ... *for use in the exercise of functions required or authorized by law* or administrative rule or involving the receipt or expenditure of public funds.

§ 24–72–202(6)(a)(I) (emphasis added). The Post's complaint alleges that, when a public official uses a personal phone to discuss public as well as private business, the billing statements generated by the phone company and kept in the official's possession are public records. We disagree.

We hold that the Post's complaint fails to allege facts which, accepted as true, state a claim that the Governor's personal cell phone billing statements are likely public records under CORA. The Post's complaint is conclusory in nature. It asserts a legal theory but does not allege facts which, if proved, would demonstrate that the Governor made the billing statements or kept or maintained them in his official capacity. The stipulation of facts the parties agreed to recites that the Governor kept and used the billing statements only for payment of the bills, did not obtain any reimbursement from the State for his pay-

---

1. We granted certiorari on the following issue: Whether the court of appeals properly held that the personal cell phone billing statements

of Governor Bill Ritter do not constitute public records subject to disclosure under the Colorado Open Records Act.

ment of them, and has not turned the bills over to any other State agency or official for use by them. Thus, the Post did not allege facts showing that he kept the personal cell phone bills in his official capacity and the burden did not shift to the Governor to demonstrate that the phone bills are not a public record under CORA. Accordingly, we affirm the judgment of the court of appeals.

## I.

The parties have cooperated with each other in framing the legal and factual issues for decision by the district court, the court of appeals, and us. Before us, we have the Post's complaint for declaratory judgment and order to show cause why the records should not be disclosed, a stipulation of facts the Governor and the Post entered into describing the contents of the records in question, the parties' briefs, and the oral argument audio recordings. In addition, as did the court of appeals, we consider the Post's first amended complaint although the trial court denied the Post leave to file it.

The Post's complaint filed with the district court on August 11, 2008 alleges a legal theory that the Governor's personal cell phone bills are public records:

> Under the CORA, any person may request access to inspect and obtain a copy of any public record. *See* § 24–72–203(1)(a), C.R.S.
>
> Under the CORA, a public record is defined as any writing "made, maintained or kept by ... any ... political subdivision of the state ... for use in the exercise of functions required or authorized by law or administrative rule." *See* § 24–72–202(6)(a)(I), C.R.S. This provision makes clear that records that involve no expenditure of public funds are nevertheless "public records," and are subject to inspection under the CORA....
>
> The Governor's position that the subject telephone records are not public records under the above-quoted definition is not well taken. The Governor's cell phone is used "in the exercise of functions required or authorized by law or administrative rule," and the records of its use are likewise generated as a by-product and con-

temporaneous records of the conduct of public business. The records are regularly furnished to the Governor by his cell phone provider, and maintained or kept by him for a period of time, and in any event remain available to him upon request from the carrier. The Governor has confirmed that some or all of the records requested are in his possession, custody, and control. It is obvious that if any high ranking government executive may "privatize" his conduct of public business by establishing a private account for dealing with private providers of communications technologies, it would allow government officials to unilaterally create a vast and unacceptable "loophole" in the requirements of CORA.

The complaint goes on to assert that "[t]he documents requested by *The Post* were 'made, maintained, or kept' by the State for use in the exercise of functions authorized by law, and are therefore 'public records.' *See* § 24–72–202(6)(a)(I), C.R.S." The complaint requests a court order directing Governor Ritter to show cause why he should not allow inspection of the requested records.

On September 5, 2008, the Governor filed a motion under C.R.C.P. 12(b)(5) to dismiss the Post's complaint for failure to state a claim upon which relief can be granted. In that motion, the Governor contends that the requested personal cell phone bills are not "public records" under CORA because he did not make, maintain, or keep the bills in his official capacity. Alternately, he argues that the bills are protected under the work product exception to CORA, section 24–72–202(6)(b)(II). Finally, he claims that personal calls not pertaining to official business are protected by CORA's exception for confidential constituent communications, pursuant to section 24–72–202(6)(a)(II)(C).

In response to the Governor's motion to dismiss, the Post contends that, because the Governor's cell phone usage was likely billed on a flat rate plan, he had no need to keep the bills other than to determine with whom he spoke and on what date and time, since the amount owed was not related to the calls recorded. The Post also claims that the Governor "made" the cell phone bills because

by using his phone, he in effect requested that the phone company create the bills. The Post argues that none of the calls listed on the billing statements satisfy CORA's work product exception because the records do not express an opinion and are not deliberative in nature. Finally, the Post posits that the "constituent communications" exception does not apply to the requested bills because the bills themselves are communications from the Governor's cell phone service provider, and not from a constituent.

On October 13, 2008 the parties filed with the court a joint stipulation of facts for the show cause hearing the court set for October 17, 2008. The stipulation reads in full as follows:

The Parties, by and through their undersigned counsel, hereby stipulate that the following facts are undisputed, and can be treated as admitted, by all parties, for purposes of the Hearing on the Order to Show Cause, on October 17, 2008, at 1:30 p.m.:

1. The Governor has two cell phones. One is a BlackBerry issued and paid for by the State (the "State Black-Berry"), which is primarily used by the Governor to send and receive e-mail and to review his schedule. The Governor makes only occasional use of the State BlackBerry to place and receive phone calls.

2. The Governor also has a personal cell phone ("Governor's personal cell phone"), which is not owned or issued by the State. The State neither pays nor reimburses the Governor for charges associated with its use.

3. Substantially all of the cellular phone calls that the Governor places and receives, while he is acting as Governor, during regular business hours, are placed or received on the Governor's personal cell phone.

4. Based upon his personal knowledge, the Governor cannot dispute that the vast majority of the calls listed on the billing statements for the Governor's personal cell phone, that were initiated or received by him during regular business hours (8 a.m. to 6 p.m., Monday through Friday) are calls in which the Governor discussed public business, in his capacity as the Governor.

5. The requested bills contain approximately 10,000 phone calls and approximately 39,000 minutes of call time. The billing statements at issue contain the following information for each call listed: date; time; telephone number; rate (peak, off-peak, weekend, etc.); usage type (in-plan, out of plan, etc.); origination (city and state from which call originated); destination (for outbound calls, the city and state of the number called); minutes (duration of the call); airtime charges (if any); long-distance/other charges (if any); and total charges (if any).

6. The bills do not include the names of the persons who called the Governor or whom the Governor called. The bills do not reflect the content of any conversation. To the extent that he can identify phone numbers, the Governor does not recall the content of the majority of phone conversations reflected in the bills.

7. *To date, the Governor has used the bills at issue only for the purpose of determining the amount that he owes. He has not submitted the bills to any other state officer or employee for any purpose. The bills are generated by the phone service provider, and are provided to the Governor at his request. No other state officer or employee keeps or maintains the bills.*

(Emphasis added). Thus, the stipulated facts include a recitation that the Governor owns the phone, pays all the bills from the cell phone company, has used the bills only to determine the amount he owes, and has not submitted the bills to any other state officer or employee for any purpose.

The show cause hearing did not occur because the trial court granted the Governor's motion to dismiss and denied the Post's motion for leave to file an amended complaint.

In dismissing the complaint, the trial court determined that the Post did not sufficiently allege facts demonstrating that the phone bills were likely public records under CORA.

The trial court concluded that the complaint "fail[ed] utterly to allege a single non-conclusory fact" supporting the contention that the cell phone bills were kept for official use. In support of this conclusion, the trial court stated that

> There are simply no allegations in the complaint—not even one—from which any fact finder could conclude that these billing records were kept and maintained by Defendant for any purpose other than the purpose for which all people, governors and non-governors alike, keep bills: namely, to pay them, and perhaps also to make sure the charges are correct.

The trial court also rejected the Post's contention that it need only allege a potential future official use for the bills to show that they are likely public records:

> Plaintiffs are correct that a public official may not insulate palpably public records from CORA by the simple artifice of choosing not to make use of them. But neither is every single record kept by an official a public record just because an imaginative claimant can concoct a circumstance in which the record might in the future have some conceivable official use.

On appeal, the court of appeals affirmed the trial court's judgment. *Ritter,* 230 P.3d at 1241. We agree.

## II.

We hold that the Post's complaint fails to allege facts which, accepted as true, state a claim that the Governor's personal cell phone billing statements are likely public records under CORA. The Post's complaint is conclusory in nature. It asserts a legal theory but does not allege facts which, if proved, would demonstrate that the Governor made the billing statements or kept or maintained them in his official capacity. The stipulation of facts the parties agreed to recites that the Governor kept and used the billing statements only for payment of the bills, did not obtain any reimbursement from the State for his pay-

ment of them, and has not turned the bills over to any other State agency or official for use by them. Thus, the Post did not allege facts showing that he kept the personal cell phone bills in his official capacity and the burden did not shift to the Governor to demonstrate that the phone bills are not a public record under CORA.

### A. Standard of Review

#### 1. Appellate Review of a C.R.C.P. 12(b)(5) Motion

██ "We view with disfavor a C.R.C.P. 12(b)(5) motion to dismiss for failure to state a claim." *Bly v. Story,* 241 P.3d 529, 533 (Colo.2010). We review a 12(b)(5) motion de novo and apply the same standards as the trial court. *Id.*

██ We accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Id.* Nonetheless, we are not required to accept as true legal conclusions that are couched as factual allegations. *See Western Innovations, Inc. v. Sonitrol Corp.,* 187 P.3d 1155, 1158 (Colo.App.2008); *cf. Wenz v. National Westminster Bank, PLC,* 91 P.3d 467, 469 (Colo.App.2004) (applying rule in consideration of motion to conduct discovery on issue of personal jurisdiction).

██ We uphold the grant of a C.R.C.P. 12(b)(5) motion to dismiss only when the plaintiff's factual allegations do not, as a matter of law, support the claim for relief. *Bly,* 241 P.3d at 533. When considering a motion to dismiss for failure to state a claim, we may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, and matters proper for judicial notice. *Walker v. Van Laningham,* 148 P.3d 391, 397 (Colo.App.2006).

#### 2. Statutory Construction

██ Statutory construction proceeds de novo. *Specialty Rests. Corp. v. Nelson,* 231 P.3d 393, 397 (Colo.2010). When construing a statute, we effectuate the intent of the General Assembly; we look to the plain meaning of the statutory language and consider it within the context of the statute as a whole. *South Fork Water & Sanitation*

*Dist. v. Town of South Fork,* 252 P.3d 465, 468 (Colo.2011); *Bly,* 241 P.3d at 533. We construe the entire statutory scheme to give consistent, harmonious, and sensible effect to all parts. *South Fork,* 252 P.3d at 468. We give effect to words and phrases according to their plain and ordinary meaning. *Southern Ute Indian Tribe v. King Consolidated Ditch Co.,* 250 P.3d 1226, 1233–34 (Colo.2011).

■■■ If the statutory language is clear, we apply it. *Specialty Rests. Corp.,* 231 P.3d at 397. If the statutory language is ambiguous, we may use other tools of statutory interpretation to determine the General Assembly's intent. *Crandall v. City of Denver,* 238 P.3d 659, 662 (Colo.2010). We avoid interpretations that would lead to an absurd result. *Id.*

## B. CORA

### 1. Public Records under CORA

■■■ With the passage of CORA, the General Assembly declared it to be the public policy of Colorado that "all public records shall be open for inspection by any person, at reasonable times," except as otherwise provided by law. § 24–72–201, C.R.S. (2010). Under CORA, the custodian of a public record is generally required to make that record available to the public, subject to certain exceptions. *Denver Publ'g. Co. v. Bd. of Cnty. Com'rs,* 121 P.3d 190, 195 (Colo.2005)("*Denver Publishing* ").

As in other CORA cases, the central issue in this case is whether the records requested by the Post are "public records" under CORA. *See, e.g., id.,* 121 P.3d at 191; *Wick Commc'ns Co. v. Montrose Cnty. Bd. of Cnty. Commr's,* 81 P.3d 360 (Colo.2003). A "public record" is a writing

> *made, maintained, or kept* by the state, any agency, institution, ... or political subdivision of the state ... *for use in the exercise of functions required or authorized by law* or administrative rule or involving the receipt or expenditure of public funds.

§ 24–72–202(6)(a)(I) (emphasis added).

This statutory language contains two phrases important to determining whether a record is a "public record" subject to disclosure under CORA. First, a public record is a writing "made, maintained, or kept by the state, any agency, institution, ... or political subdivision of the state." *Id.* Second, a public record is a record that is made, maintained, or kept for a particular reason: "for use in the exercise of functions required or authorized by law or administrative rule." *Id.* Acknowledging this framework, our cases interpreting CORA have focused on (1) who made, maintained, or kept the requested record, and (2) why he, she, or it did so.

Interpreting CORA's definition of "public record" in *Wick Communications v. Montrose County Board of County Commissioners,* we determined that "CORA was not intended to cover information held by a government official in his private capacity." 81 P.3d at 364. According to *Wick,* to prevail under CORA when a requested record is held by an individual who is a government official, a plaintiff must present evidence showing that the requested document was made, maintained or kept by the individual in his official capacity. *See id.* at 366. In *Wick,* we held that a public official's private diary, though he relied on it to prepare an outline used in a termination review hearing, was not a "public record" subject to mandatory disclosure under CORA. *Id.* at 366.

Two years later, in *Denver Publishing,* we considered whether sexually explicit emails sent between two public officials and stored on a government computer system were public records subject to disclosure under CORA. 121 P.3d at 199. Subject to certain exceptions, CORA includes correspondence of elected officials within its definition of "public records," when the correspondence has "a demonstrable connection to the exercise of functions required or authorized by law." § 24–72–202(6)(a)(II)(B), C.R.S. (2010). In *Denver Publishing,* we determined that the "demonstrable connection" language of the statute did not broaden the category of records subject to disclosure under CORA but, instead, reflected the General Assembly's intent to apply the "for use" standard from CORA's public records definition to the correspondence of elected officials. 121 P.3d at 200.

Pursuant to the "for use" clause contained in CORA's definition of public records, we determined that an email is only a public record if it is "for use in the performance of public functions or involve[d] the receipt and expenditure of public funds." *Id.* at 198–99. To meet that burden, we required the email correspondence to address the performance of public functions or the receipt and expenditure of public funds. *Id.* at 199. We concluded that a large portion of the requested emails were not public records subject to disclosure under CORA because they contained only sexually explicit messages not intended for use in the performance of public functions. *Id.* at 203.

In *Denver Publishing*, we analyzed the legislative history leading to the passage of CORA and concluded that the "for use" clause has great significance to CORA's "public records" definition. *See id.* at 197. We noted that a year prior to passage of CORA the General Assembly failed to pass similar legislation that included a much broader definition of public records. *Id.* In discussing a Legislative Council report introducing the statutory language eventually codified as CORA's "public records" definition, we highlighted the importance of the "for use" clause in distinguishing CORA's "public records" definition from that found in the previously failed legislation:

> Although the definition proposed in the report included all written materials, it narrowed the class of written documents to those "made, maintained, or kept ... *for use* in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." This proposed definition was intended to protect individual privacy and narrow the focus of the open records act to those records directly related to the functions of government.

*Id.* (emphasis in original) (citations omitted).

As these cases illustrate, the "for use" clause in CORA's definition of public records creates a question of intent.

### 2. Burden of Proof

██ ██ As we explained in *Wick*, a plaintiff requesting documents pursuant to CORA must establish that CORA applies. 81 P.3d at 363. To do that, the plaintiff must show that a public entity improperly withheld a public record. *Id.* When the custodian of the requested record is an individual who is also a public official, the plaintiff bears the burden of proving that the requested records are "likely public records." *Id.* at 364. To meet this burden, the plaintiff must show that the requested records are made, maintained, or kept in a public or official capacity. *Denver Publishing*, 121 P.3d at 199; *Wick*, 81 P.3d at 362. If the plaintiff meets this initial burden, the burden of proof then shifts to the custodian to show that the requested records are not public records. *Wick*, 81 P.3d at 362.

### C. Application

The issue on which we granted certiorari—whether the court of appeals properly held that the personal cell phone billing statements of Governor Bill Ritter do not constitute public records subject to disclosure under the Colorado Open Records Act—requires us to address two separate sub-issues. First, we must determine whether the court of appeals correctly interpreted CORA's definition of a public record. Second, we apply that definition to determine whether the court of appeals correctly affirmed the trial court's dismissal of the Post's complaint.

### 1. The Meaning of "Made," "Maintained," and "Kept" in CORA's "Public Records" Definition

The definition of "public records" is two-pronged. Our prior case law established that "public records" include writings (1) made, maintained, or kept by the state, an agency, or political subdivision of the state, (2) for use in the performance of public functions or that are involved in the receipt and spending of public money. *See Denver Publishing*, 121 P.3d at 195–96. We address each of the first prong's three operative verbs in turn.

CORA does not provide any further definition of the word "made" as it is used in the definition of public records. The word "made" may be defined in a number of ways,

depending on the context in which the word is used. To give effect to this phrase according to its plain and ordinary meaning, we interpret the word in the context of the statutory provision in which it is found, which refers to making a "writing." *See Southern Ute Indian Tribe,* 250 P.3d at 1233–34.

CORA defines a "writing" to include "all books, papers, maps, photographs, cards, tapes, recordings, or other documentary materials, regardless of physical form or characteristics . . . digitally stored data, including without limitation electronic mail messages, but does not include computer software." § 24–72–202(7), C.R.S. (2010).

"Made" is the past tense of "make." "Make" means to "create" or "to bring (a material thing) into being by forming, shaping, or altering material." *Webster's Third New Int'l Dictionary* (2002) at 1363–64. Synonyms include "fashion" or "shape." *Id.* In the case before us, the Governor is the public official the Post alleges "made" the phone bills. In the context of making a "writing," such as the cell phone bills in this case, the Governor must have created or fashioned those bills. *Id.*

■ The Post argues that the Governor "made" the requested cell phone bills by participating in the phone calls that resulted in the billing statement. We reject this construction of the statute. Giving it credence would broaden CORA's definition of a public record beyond that which the General Assembly has provided, leading to unintended results. *See Crandall,* 238 P.3d at 662.

We consider the statutory text itself the best indication of the General Assembly's intent. Accordingly, we refuse to adopt a definition of the word "made" that is contrary to its common and accepted meaning. In common parlance, one does not "make" a "writing" merely by performing acts that a private third party memorializes in a writing it makes. According to the Post's theory, any writing memorializing an event in which a public official participates would constitute a "writing made . . . by the state." However, to make a "writing" pursuant to CORA, the Governor must have created or fashioned or directed creation or fashioning of the cell phone bills. As the court of appeals aptly

observed, 230 P.3d at 1242, the carrier not the Governor created the phone bills. "[The Post] has requested the records that memorialize the fact that the conversations occurred, which are created and generated only by the service provider." *Id.*

To "maintain" a "writing" means keeping the writing in a state of repair. *Webster's Third New Int'l Dictionary* (2002) 1362. Many actions could fall within the ambit of "maintaining" a "writing," including taking steps to ensure the physical integrity of the document, updating the information it contains, or directing another to do the same. Because we interpret statutes to give sensible effect to all parts, the word "maintain" must mean something other than to merely "keep" a "writing." *See South Fork,* 252 P.3d at 468. In this case, the Post does not allege any facts showing that the Governor "maintained" the cells phone bills, other than by keeping them.

To "keep" a "writing" means to have the care of that writing. *Webster's Third New Int'l Dictionary* (2002) 1235. Thus, one "keeps" a "writing" when it is in his care, custody, or control. Similarly, one "keeps" a "writing" if he directs another to have care, custody, or control of the document. In this case, the Governor is in possession of the phone bills, and therefore has "kept" them. But, as we discuss below, the Post must allege facts showing that the Governor kept the writing in his official capacity. If it has done so, the burden then shifts to the Governor to demonstrate that the writing is not a public record under CORA.

### 2. Whether the Governor Made, Maintained, or Kept the Cell Phone Bills in His Official Capacity

■ We will uphold the trial court's dismissal of the complaint only if the Post's complaint does not contain sufficient, well-pleaded factual allegations that, when accepted as true, state a claim that the requested cell phone bills are likely public records subject to disclosure under CORA. *See Bly,* 241 P.3d at 533; *Wick,* 81 P.3d at 362. Whether the trial court erred in denying the Post leave to file an amended complaint is not

before us on certiorari. However, like the court of appeals, we observe that the amended complaint in any event does not allege facts showing that these cell phone bills are likely public records.

When the custodian of a requested record is an individual who is also a public official, the plaintiff must show that the record is likely a public record. *Wick*, 81 P.3d at 362. To carry this burden, the plaintiff must show that the individual made, maintained, or kept the record in his or her official capacity. *Id.* We determine whether the plaintiff carried this burden by examining the relevant circumstances of the case. *Id.* at 366. For example, in *Wick* the plaintiff had failed to show that the requested diary was likely a public record, because it was not used in the daily functioning of the custodian's public office, was not left at the office, and was not offered to others for their own use. *Id.*

While the circumstances we examined in *Wick* provide guidance to courts considering the question of official capacity, the inquiry is case-specific. Further, the question of whether the requested record was made, maintained, or kept in an official capacity necessarily overlaps with the question of whether the record was made, maintained, or kept for official use. *See Wick*, 81 P.3d at 364. As we stated in *Wick*, when an individual who is also a public official is the custodian of the requested record, "determining in what capacity a document is held resolves the underlying question of whether the document is a public record." *Id.*

At the pleading stage, the question of whether the document is made, kept, or maintained in the individual's private or public capacity cannot be entirely separated from the question of the document's intended use. A court analyzing in what capacity a public official made, maintained, or kept a requested record should consider factors that

go to whether the record was "for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." § 24-72-202(6)(a)(I); *see Wick*, 81 P.3d at 366.

This is not to say that the plaintiff bears the burden at this stage to conclusively prove that the requested document exists "for use in the performance of public functions or the receipt and expenditure of public funds." *See Denver Publishing*, 121 P.3d at 199. Rather, the court's inquiry into the capacity in which the records are held should be influenced by the existence or absence of facts suggesting the requested record was made, maintained, or kept for official use. If the plaintiff makes an adequate showing that the requested record was made, maintained, or kept in an official capacity, then the burden shifts to the defendant to show that the requested document is not a public record. *Wick*, 81 P.3d at 364; *Denver Publishing*, 121 P.3d at 199.

Applying these principles to the instant case, we conclude that the Post failed to state a claim upon which relief can be granted. The only fact contained in the complaint regarding the creation or fashioning of the bills alleges that the cell phone bills are "generated as a byproduct and contemporaneous records of the conduct of public business." Making a phone call does not amount to creating or fashioning the phone bills or directing the carrier to do so. Absent a factual allegation that the Governor participated in their creation or fashioning, other than passively as a bill payer, the complaint falls short of alleging sufficient facts, accepted as true, that the Governor "made" the cell phone bills within the meaning of CORA's public records definition.[2]

The parties do not dispute that the Governor "kept" some or all of the requested cell

---

**2.** Even if we accepted as true the factual allegations made in the Post's first amended complaint, we would reach the same conclusion. The first amended complaint alleges that the Governor made official phone calls on his personal cell phone with "both knowledge and intent that the phone company providing the service will automatically generate a record indicating the time the call begins and ends, as well as the phone number of the party on the other end of the conversation; thereby the Governor actively participates in making the record of the phone calls which [are] the subject of this Complaint." But a conclusory allegation of intent, absent more, does not give rise to the inference that the Governor directed the phone company to create an itemized phone bill. Acquiescence to the receipt of a bill does not equate to active participation in its creation.

phone records and the complaint alleges that "the Governor has confirmed that some or all of the records requested are in his possession, custody, or control." But, under CORA, the question at the pleading stage is whether the Governor made, kept or maintained the record at issue in his official capacity.

Here, the Post proceeded on the theory that any record memorializing official conduct and kept by a government official constitutes a public record because the record can potentially be used for official business. That theory disregards our holding in *Wick*, where we refused to order disclosure of the diary at issue, even though the public official used his diary to prepare for a termination review hearing. *See Wick*, 81 P.3d at 366. As *Wick* demonstrates, to show that a requested record was kept in an official capacity, CORA requires more than "an alleged potential future official use." *See Ritter*, 230 P.3d at 1244. Even if we consider the allegations in the first amended complaint the trial court disallowed, the Post's pleading fails to state a claim. *See Bly*, 241 P.3d at 529. Although the requested cell phone bills presumably memorialize myriad phone calls made by the Governor during regular business hours, the complaint does not allege facts sufficient to demonstrate that the Governor kept those bills in his official capacity. As in *Wick*, the requested records in this case were not held in any government office, were not made available to other state officers or employees for any purpose, and were not used in the daily functioning of the Governor's office. *See Wick*, 81 P.3d at 366.

That the Governor kept the phone bills only for the purpose of paying them is supported by the joint stipulation of facts the parties agreed to in this case of which we take judicial notice, as did the court of appeals. *See Ritter*, 230 P.3d at 1242; *Walker*, 148 P.3d at 397. The stipulation states that the use the Governor makes of the phone bills is "only" for personal payment purposes. There are no facts in the joint stipulation of

facts or in the factual allegations of the complaint showing the Governor intended to use the billing statements in his official capacity.[3] In sum, the Post did not allege facts showing that the Governor "made, maintained, or kept" the personal cell phone bills in his official capacity. Thus, the burden did not shift to the Governor to show that phone bills are not a public record under CORA.

Read in detail and its entirety, the Post's complaint is a conclusory assertion of a legal theory containing a supposition that the General Assembly intended for any record somehow connected with the conduct of public business to be a public record under CORA. In assessing the Post's complaint, however, we are bound by CORA's statutory language. Whether or not disclosure of the Governor's personal cell phone bills might be desirable as a matter of public policy, the complaint simply fails to state a claim that is cognizable under the current governing statutes and our case law. Granting the Post's request for relief would require us to expand CORA's applicability beyond that intended by the General Assembly. Because expanding a statute's reach is an inherently legislative function not proper for a court, we decline to adopt the Post's suggested expansion of CORA's public records provisions. Should the General Assembly decide to expand the applicability of CORA, it is free to do so.

### III.

Accordingly, we affirm the judgment of the court of appeals.

Justice RICE dissents, and Justice EID joins in the dissent.

Justice EID dissents.

Justice MÁRQUEZ does not participate.

Justice RICE, dissenting.

In 1967, the Colorado Legislative Council warned that "excessive government secrecy, especially when imposed arbitrarily by elect-

---

**3.** Nor does the first amended complaint allege facts supporting the contention that the Governor intended to use the requested cell phone bills in his official capacity. The first amended complaint alleges only potential uses for the request-ed cell phone bills, each of which directly contradicts the parties' joint stipulation that the Governor used the bills solely for the purpose of determining the amount he owed.

ed or administrative officials, can endanger the freedom of speech concept embodied in the first amendment and may threaten democracy generally." Colo. Legis. Council, *Open Pub. Records for Colorado,* Research Publ'n. No. 126, at xi ¶ 1 (1967) ("*OPRC*"). Worried that Colorado courts would fail to recognize the "people's right to know" about the conduct of their governmental representatives, the Council implored the General Assembly to enact broad legislation to guarantee the press and the public the "ultimate right of access" to records of governmental conduct, denial of which would be "the exception rather than the rule" and of which public officials would bear the burden of justifying. *Id.* at xi-xii ¶ 5. The legislature agreed and enacted the Council's proposed bill, now codified as the Colorado Open Records Act, sections 24–72–200.1 to –206, C.R.S. (2010) ("CORA"). Ch. 66, 1968 Colo. Sess. Laws 201–04.

Today, the majority casts aside the legislature's attempt to ensure transparency in Colorado government. By doing so, the majority creates an incentive for public officials to shield records of phone conversations about official business by intermingling them with records of personal calls, essentially affording the opportunity to purchase an unwritten exception to CORA for the price of a monthly cell phone plan. Because this interpretation is squarely at odds with the legislature's intent in enacting the statute, I respectfully dissent.

## I. Facts and Procedural Posture

In 2008, Karen Crummy, a reporter for the Denver Post (collectively, the "Post"), asked then-Colorado Governor Bill Ritter to turn over bills for his personal cell phone account that contained itemized listings of phone calls during which Gov. Ritter had conducted official state business, including the telephone number of the party to whom he had spoken, the date and time of the conversation, and various other metadata about the calls.[1] Gov. Ritter refused to turn over the bills, so

the Post sued Gov. Ritter under CORA, seeking to compel him to produce the bills.

In its initial complaint, the Post summarily asserted that Gov. Ritter, as an elected official of the state, "made, maintained, or kept" the records "for use in the exercise of functions authorized by law," and therefore that the bills were public records subject to disclosure under CORA. The trial court dismissed the claim with prejudice, holding that, "as a matter of law, [the bills] are likely not 'public records' within the meaning of CORA."

The Post then requested leave to amend the original complaint, attaching a proposed amended complaint that detailed the means by which Gov. Ritter allegedly "made," "maintained," and "kept" the bills in the exercise of official functions and argued that Gov. Ritter could redact any personal calls listed on bills. The trial court denied the Post's request on futility grounds, holding that the proposed amended complaint was equally deficient under CORA. The Post then appealed to the court of appeals, which affirmed the trial court's judgment. We granted certiorari review of the court of appeals' holding.

## II. Analysis

Section 24–72–203 requires that "[a]ll *public records* shall be open for inspection by any person at reasonable times." (emphasis added). In turn, section 24–72–202(6)(a)(I) defines "public records" as "all writings made, maintained, or kept by the state, any agency, institution, ... or political subdivision of the state ... for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." *See also Denver Publ'g Co. v. Bd. of Cnty. Comm'rs,* 121 P.3d 190, 195 (Colo.2005). Section 24–72–202(6)(a)(II) explicitly includes "the correspondence of elected officials" within the scope of "public records" so long as the correspondence has "a demonstrable connec-

---

1. The Post made the request for Gov. Ritter's personal cell phone bills because he chose to make a substantial majority of his telephone calls related to official state business on his personal cell phone, for which the state did not reimburse him, rather than on his state-provided cell phone, records of which the state's previous governor had regularly turned over to members of the press under CORA.

tion to the exercise of functions required or authorized by law or administrative rule [or] ... involve[s] the receipt or expenditure of public funds."[2] To circumvent debates over whether or not particular correspondence and other public records are "writings," section 24–72–202(7) defines "writings" to "mean[ ] and include[ ] all books, papers, maps, photographs, cards, tapes, recordings, or other documentary materials, regardless of physical form or characteristics."

In order to survive a motion to dismiss, a plaintiff seeking to invoke CORA to compel disclosure of writings in the possession of a public official must demonstrate that the writings are "likely" public records under the meaning of the statute. *Denver Publ'g Co.*, 121 P.3d at 199 (citing *Wick Commc'ns Co. v. Montrose Cnty. Bd. of Cnty. Comm'rs*, 81 P.3d 360, 362 (Colo.2003)). To do so, the plaintiff must demonstrate that the writings are "made, maintained, or kept" by the official in his public capacity. *Id.* (citing *Wick*, 81 P.3d at 366). Given the early stage of litigation at which a plaintiff must clear this hurdle, however, the plaintiff need not demonstrate that the records are "definitively" public records—only that they are "likely" so. *Wick*, 81 P.3d at 364. The trial court must accept the plaintiff's factual allegations as true for the purpose of evaluating whether the writings at issue are likely public records. *See Pub. Serv. Co. v. Van Wyk*, 27 P.3d 377, 386 (2001) (citing *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 911 (Colo.1996)). If the allegations are sufficient, the burden shifts to the official to make a contrary showing. *See Wick*, 81 P.3d at 362.

Here, there is no doubt that the bills sought by the Post in this case are documentary materials of Gov. Ritter's telephonic correspondence that constitute "writings" under the meaning of CORA. Accordingly, this case centers on whether the Post sufficiently alleged that Gov. Ritter "made, maintained, or kept" the bills, and if so, that his doing so was "demonstrabl[y] connect[ed] to the exercise of functions required or authorized by law or administrative rule [or] ... involve[d] the receipt or expenditure of public funds."

The Post advances two theories of how the phone bills at issue are "public records" under the meaning of CORA. First, the Post alleges that Gov. Ritter "made" the bills by placing the underlying phone calls, which necessarily caused the phone company to record the information contained in the bills. Because the Post seeks only records of calls directly connected to Gov. Ritter's work on state business as the elected governor of Colorado and readily concedes that Gov. Ritter may redact any portion of the requested bills that documents phone calls that the governor made in a non-official capacity, the Post alleges that, as a matter of logical necessity, Gov. Ritter therefore "made" the relevant records in his official capacity. Second, the Post argues that Gov. Ritter "kept" the phone records in his official capacity by storing copies of the records as a memorialization of his conversations regarding official business for possible future use in response to allegations of misconduct on his part.

### A. Gov. Ritter's Phone Bills as "Made" Public Records

The majority rejects the Post's first allegation by narrowly limiting the scope of "made" public records to writings that an official "create[s] or fashions[s] or direct[s the] creation or fashioning of." Maj. op. at 1091. On that basis, the majority concludes that Gov. Ritter did not "make" the phone records at issue in this case. *Id.* at 1092–93. This conclusion is a failure of both statutory construction and application.

While we often attempt to interpret the legislature's intent in using a particular statutory term by turning to the term's dictionary definition, that mode of interpretation is helpful only to illustrate the commonly-accepted meaning of an unambiguous term, not to select between several plausible meanings of an ambiguous term. Here, the majority exclusively relies on *Webster's Third New International Dictionary*, which provides some twenty-seven definitions for the term "make," 1363–64 (2002), settling on the fourth definition—to "create" or "bring (a material thing) into being by forming, shaping, or altering material"—and rejecting the

2. Section 24–72–202(6)(a)(II) also contains several exceptions not relevant here.

remaining twenty-six, thereby concluding that the term "made" does not encompass Gov. Ritter's conduct with respect to the phone bills at issue. Yet, *Webster's* second definition, similarly applied, would define "ma[king]" a writing as simply "caus[ing it] to exist, occur, or appear," *see id.,* as Gov. Ritter no doubt did to the phone records at issue by placing each phone call described in the records. In this case, the dictionary does not, as the majority asserts, clarify the commonly-accepted meaning of the term "made," maj. op. at 1091, but rather illustrates its ambiguity.

When interpreting a general-purpose statutory term like "made" that is susceptible to numerous definitions, we read the term in the context of the statutory scheme as a whole and attempt to give the term the meaning intended by the legislature. *See People v. Williamson,* 249 P.3d 801, 803 (Colo.2011) (citing *Klinger v. Adams Cnty. Sch. Dist. No. 50,* 130 P.3d 1027, 1031 (Colo. 2006); *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002)). If necessary, we turn to the history of the legislation to help illuminate the legislature's intent. *Romero v. People,* 179 P.3d 984, 986 (Colo.2007) (citing *Grant v. People,* 48 P.3d 543, 546 (Colo.2002)).

In its cursory investigation of the legislature's intent in enacting CORA, the majority concludes that its narrow definition of the term "made" to mean "created or fashioned" necessarily follows from the legislature's use of the term "writings." Maj. op. at 1091. This conclusion, however, implies a narrow conceptualization of the term "writings" as documents physically penned by an official or his subordinate. The majority fails to properly consider the legislature's broad definition of the term "writings," which "means and includes all books, papers, maps, photographs, cards, tapes, recordings, or other documentary materials, regardless of physical form or characteristics." § 24–72–202(7). The majority further omits the legislature's plainly stated intent in using and defining the term "writings": "to cover all things that *could possibly be considered records* of an agency." *OPRC* at xiv (emphasis added).

Against this backdrop, the legislature's use of the term "writings" in no way implies an intent to narrowly limit the scope of the term "made." Moreover, the legislature expressly disclaimed such an implication, stating an intent "to define the term ['public records'] *very broadly* " by selecting CORA's "made, maintained, or kept" terminology, noting that a broad definition "is in keeping with the general concept of freedom of information" and is necessary to distinguish other definitions of "public records" that were "restricted to such items as formal records of completed transactions and records required by law to be kept." *Id.* at xiii–xiv (emphasis added). This sweeping language is an unqualified endorsement of the legislature's intent to include within the scope of "made" public records more than merely rote inscriptions by public officials and their subordinates describing routine governmental happenings. It suggests, rather, that where a public official knowingly causes a record to be made in his official capacity about his official acts, that the record becomes the public's business.[3]

The majority implies that a public official is necessarily a cause-in-fact of any memorialization of his conduct and that defining the term "made" exclusively in terms of causation would improperly designate private writings by third parties that happen to memorialize official conduct as "made" public records. *See* maj. op at 1091. I agree that a proximate-cause limitation is implicit in CORA, which obliges only public entities and their agents to disclose records of official conduct, not private third parties who make such records on their own accord. For example, it would be entirely sensible to exclude records associated with the telephone accounts of the people to whom Gov. Ritter

**3.** Of course, the public interest in the disclosure of that record must be balanced against the official's personal privacy interests in the record. *Wick,* 81 P.3d at 364–66. Those privacy interests, however, do not bear on whether or not a record is "made," but rather on whether it was "made" in an official or private capacity. *See id.*

at 365 (citing *Downing v. Brown,* 3 Colo. 571, 590–91 (1877)). That inquiry is not at issue in this context because the Post only requested records of phone calls relating to official business, which Gov. Ritter necessarily made in his official capacity.

spoke, since he presumably had no control over or specific knowledge of the creation of those records.

To the extent that the majority seeks to establish this limitation by defining "made" records as those writings which a public official "create[s] or fashions[s] or direct[s the] creation or fashioning of," the definition would not necessarily contradict the legislature's intent. But the majority's application of the definition to the facts of this case suggests a far more substantial and troublesome restriction on the scope of "made" public records.

In particular, the majority acknowledges the Post's allegation that the phone bills at issue are "generated as a byproduct and contemporaneous records of the conduct of public business" and that Gov. Ritter made the corresponding phone calls with "both knowledge and intent that the phone company providing the service [would] automatically generate a record" of the call. Maj. op. at 1092 & n. 2. Yet, the majority concludes that "[m]aking a phone call does not amount to creating or fashioning the phone bills or directing the carrier to do so," and that "[a]cquiescence to the receipt of a bill does not equate to *active participation* in its creation." *Id.* (emphasis added).

It is unclear from the majority's analysis what distinguishes the type of "active participation" in a record's creation or fashioning that causes a record to be "made" under the majority's view of CORA from the type of merely passive participation in a record's creation or fashioning that leaves the record outside the scope of the statute. More importantly, the majority fails to articulate why such a distinction is warranted or appropriate in light of the legislature's plainly stated intent to conceptualize "public records" in the broadest possible terms.

In any case, the Post did not allege that Gov. Ritter participated in the creation or fashioning of the records in some esoterically attenuated fashion. Rather, the Post alleged, and Gov. Ritter stipulated, that he: (a) signed up for a personal cell phone plan; (b) placed phone calls on the cell phone in his official capacity as governor during which he discussed official business; (c) received,

viewed, and paid an itemized bill that included the numbers dialed, the date and time, and various other information about each of the calls; and (d) with full knowledge that making similar phone calls in the future would necessarily generate identical records of those calls on future bills, continued to make phone calls and receive bills with predictable records of the calls.

By doing so, Gov. Ritter actively "directed" his cell phone provider to "create" and "fashion" the records of the calls, thus satisfying the majority's proffered definition of the term "made." And because the Post seeks only records of calls directly connected to Gov. Ritter's official business and does not object to the redaction of any records of calls made in a non-official capacity, the records at issue are necessarily connected to Gov. Ritter's exercise of functions required by his position as governor. Accordingly, the Post sufficiently alleged that Gov. Ritter "made" the records at issue in his official capacity.

**B. Gov. Ritter's Phone Bills as "Kept" Public Records**

Turning to the Post's second theory, the majority correctly concedes, as both parties do, that Gov. Ritter "kept" the records under the meaning of CORA. Maj. op. at 1092–93. Nevertheless, the majority concludes that the Post did not sufficiently allege that Gov. Ritter kept the records in his official capacity, rather than in his private capacity, as required for the records to be public under CORA. *Id.* at 1093. The majority reaches this conclusion by setting a virtually impossible-to-satisfy legal standard for "public records."

In its proposed amended complaint, the Post alleged that Gov. Ritter kept the phone records at issue bearing in mind the possibility that they could one day be used by him or other state officials to exonerate him against charges of misconduct. The Post further alleged that Gov. Ritter's cell phone was on a flat-rate plan for which itemized call listings had no bearing on how much he paid, and therefore that he had no personal reason to keep the itemized listings.

The majority acknowledges and rejects these allegations, holding that CORA requires "more than 'an alleged potential future official use.'" Maj. op. at 1093 (quoting *Denver Post Corp. v. Ritter*, 230 P.3d 1238, 1244 (Colo.App.2009)). The majority then notes, based on Gov. Ritter's stipulations to the trial court, that the only plausible reason for Gov. Ritter to keep the phone bills at issue—namely, to pay them—was personal, not official. *Id.* at 1093. On those bases, the majority proceeds to conclude that the Post's complaint did not sufficiently allege that the bills were likely public records. *Id.*

Contrary to the majority's conclusion, Gov. Ritter's proffered personal reason for keeping the phone bills is wholly irrelevant to the issue of whether the Post's proposed amended complaint alleged facts sufficient to conclude that the bills were likely public records under CORA. At most, that reason raises a dispute over whether Gov. Ritter actually kept the records in his official capacity. At the motion-to-dismiss stage of litigation, such factual disputes are not within the scope of our inquiry. Rather, we must simply decide whether the Post's allegations, taken as true, sufficiently allege that the phone bills at issue are likely public records. Accepted as true, the Post's allegations plainly demonstrate that Gov. Ritter kept the phone bills at issue in his official capacity.

Moreover, the majority's "more than 'an alleged potential future official use'" requirement effectively eliminates the possibility that any CORA plaintiff could sufficiently allege that a public official likely "kept" records in his official capacity, unless the official manifests an obvious intent to keep them in that capacity. This requirement, in conjunction with the majority's narrow construction of "made" records, permits a public official to: (a) generate mixed records of his personal and official conduct; (b) store them at home and deny his colleagues access to them; (c) prevent CORA disclosure of the records simply by asserting a plausible reason to keep the records in his personal capacity; and (d) retain the right to someday assert the records in his official capacity if they have exculpatory value.

By promulgating this requirement, the majority effectively encourages public officials to intermingle records of their official conduct with records of their personal conduct by granting them the sole discretion to determine whether and, if so, when to release such records to the public. That result could not be more plainly contrary to the legislature's intent to make non-disclosure of official records a rare exception to CORA's rule of transparency and to place a high burden on officials seeking to prevent disclosure of such records.

### III. Conclusion

While we should not discourage public officials from recognizing the efficiency and convenience of using a single device to conduct both personal and official calls, neither should we allow them to use that efficiency and convenience as an excuse to shield records of their official conduct from the citizens on whose behalf they serve. The Post sufficiently alleged that Gov. Ritter likely made and kept the phone records requested by the Post in this case in his official capacity, and the records were therefore likely public records under the meaning of CORA. Accordingly, the trial court's dismissal of the Post's complaint was unwarranted under CORA and *Wick*, and I would reverse the judgment of the court of appeals on that basis. Because the majority reaches the opposite result by interpreting CORA in plain contravention of the legislature's intent, I respectfully dissent.

I am authorized to state that Justice EID joins in this dissent.

Justice EID, dissenting.

I join the dissent. I write separately merely to emphasize that this case involves records of phone calls made by a public official conducting official business. Those records may be "kept" under the CORA statute for a variety of reasons, including, as the official asserts in this case, as proof of payment of the bill. However, common sense tells us that the phone records may also be kept for the purpose of maintaining a call log, so that it can be determined—perhaps at a date far into the future—who the

official called. The fact that the official in this case stored the records at home does not change that result. Accordingly, I respectfully dissent.