CHIEF JUSTICE RICE delivered the Opinion of the Court. ¶1 In this case, we' consider whether a complaint alleging a violation of article V, section 50 of the Colorado Constitution (“section 50”) based solely on a theory of subsidization states a claim for relief sufficient to overcome a motion to dismiss pursuant to C.R.C.P. 12(b)(5). We hold that it does not. Instead we hold that to state a claim for relief under section 50, a complaint must allege that the State made a payment to a person or entity — -whether directly to that person or entity, or indirectly through an intei’mediary — for the purpose of compensating them for performing an abortion and that such an abortion was actually performed. I. Facts and Procedural History ¶2 Petitioner Jane E. Norton sued Rocky Mountain Planned Parenthood, Inc. (“RMPP”), Governor John W. Hickenlooper, the Executive Director of the Colorado Department of Health Care Policy and Financing, and the Executive Director of the Colorado Department of Public Health and Environment (“CDPHE”), for violating section 50. Section 50 provides, “No public funds shall be used by the State of Colorado, its agencies or political subdivisions to pay or otherwise reimburse, either directly or indirectly, any person,, agency or. facility for the performance of any induced abortion. ...” ¶3 Prior to filing this suit as a private citizen, Norton had served as Executive Director of CDPHE. In 2001, while serving in that role, Norton hired an accounting firm to determine whether RMPP was “separately incorporated, maintain[ed] separate facilities, and maintain[ed] financial records which demonstrate!® financial independence” from Planned Parenthood of the Rocky Mountains Services Corporation (“Services Corp”), an organization that offers abortion services. The accounting firm determined that RMPP was “subsidizing the rent for Services Corp., an affiliate that performs abortions.” From this information, Norton concluded that whenever CDPHE provided funding to RMPP, for example by contracting with RMPP to perform breast and cervical cancer screenings, it was violating section 60. As a result, Norton terminated the State’s contractual relationship with RMPP and ceased all taxpayer funding of that organization. In 2009, after Norton had left CDPHE, the State resumed making payments to RMPP, prompting Norton to file this lawsuit in which she sought declaratory and injunctive relief against the State officials and pursued a claim of unjust enrichment against RMPP. ¶4 Norton alleged in her complaint that the State officials violated section 60 by paying approximately $14 million[1] of public funds to RMPP for non-abortion medical-services. Specifically, Norton’s complaint alleged that, in making these payments, the State subsidized the abortion operations of Ser-' vices Corp., because giving state funds to RMPP allowed RMPP to charge below-market rent to Services Corp. for the use of RMPP’s facilities. Norton did not allege that the State paid public funds to RMPP or to Services Corp. to compensate either organization for actually performing abortions. ¶5 The trial court dismissed Norton’s complaint under C.R.C.P. 12(b)(5) for failure to state a claim, concluding that Norton did not allege “any specific abortion that is being supported with [state funds].” The trial court reasoned that, in order to fall within the scope of section 50, a payment made by the State, whether directly or indirectly, to a health care provider must be connected to the performance of an abortion. . ¶6 The court of appeals affirmed, holding that the language of section 50 “requires that the purpose for which the State makes the payment be analyzed.” Norton v. Rocky Mountain Planned Parenthood, Inc., 2016 COA 3, ¶ 17, 411 P.3d 162. The court of appeals concluded that if it were to adopt Norton’s interpretation of “directly or indirectly” to refer to how the funds ultimately are used by the payee, it would lead to an absurd result. Id. at ¶ 24. For example, the State pays salaries to its employees. The court of appeals reasoned that if-one of those employees donated money to Services Corp., under Norton's interpretation, the payment of salary to the employee would be an indirect payment for an induced abortion and would violate section 50. Id. The court of appeals held that this result cannot have been intended by'the electorate when it enacted section 50 because the connection to an induced abortion is too attenuated from the reason for the initial payment of salary to the employee. Id. The court of appeals concluded that because, in this example, the State paid the employee for services other than performing induced abortions,- section 50 was not violated. Id. The court of appeals held that the same is true for the State paying RMPP for services'other than performing induced abortions. Id. at ¶ 25. Accordingly, the court of appeals concluded that, because Norton did not allege that the State made payments to RMPP or Services Corp. for the purpose of reimbursing them for performing abortion services, the trial court properly dismissed the complaint. Id. at ¶ 26. We granted certio-rari.[2] II. Standard of Review ¶7 We review a C.R.C.P. 12(b)(5) motion to dismiss de novo and apply the same standards as the trial court. Denver Post Corp. v. Ritter, 255 P.3d 1083, 1088 (Colo. 2011). We accept all factual allegations in the complaint as true, viewing them in the light most favorable to the plaintiff, but we are not required to accept bare legal conclusions as true. Id. We will uphold the grant of a C.R.C.P. 12(b)(5) motion only when the plaintiffs factual allegations do not, as a matter of law, support the claim for relief. Id. When considering a motion to dismiss for failure to state a claim, we may consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, and matters proper for judicial notice. Id. ¶8 The interpretation of a constitutional provision is a question of law that we review de novo. Gessler v. Colo. Common Cause, 2014. CO 44, ¶ 7, 327 P.3d 232, 235. “When interpreting a constitutional amendment adopted by citizen’s initiative, we ‘give effect to the electorate’s intent in enacting the amendment.’ ” Dwyer v. State, 2015 CO 58, ¶ 19, 357 P.3d 185, 191 (quoting Colo. Ethics Watch v. Senate Majority Fund, LLC, 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253). To this end, words used in the . Constitution are to be given “the natural and popular meaning usually understood by the- people who adopted them.” Urbish v. Lamm, 761 P.2d 756, 760 (Colo. 1988). If the language of a constitutional provision is clear and unambiguous, we will enforce it as written. Colo. Ethics Watch, ¶ 20, 269 P.3d at 1254. III. Analysis ¶9 Norton argues that her complaint alleged a violation of section 50 by stating that (1) the State made payments to RMPP using public funds; (2) RMPP and Services Corp. are “conjoined, interrelated, and integrated affiliates”; and (3) Services Corp. offers abortion services. Norton thus contends that, regardless of what the payments are for, when the State pays any public funds to RMPP, it “indirectly” pays for the abortion operations of Services Corp. in violation of section 50. Under Norton’s theory, when the State pays RMPP for any service, RMPP earns a profit, making it possible for RMPP to subsidize Services Corp. by charging below-market rent and sharing medical staff and supplies. 1Í10 We conclude that section 50 does not support a claim alleging a violation based on such a theory of subsidization. We reach this conclusion by reviewing section 50’s plain language, focusing in particular on the terms “pay for” and “indirectly.” Consistent with the unambiguous meaning of those terms, we hold that, to state a claim for relief under section 50, a plaintiff must allege that the State paid or reimbursed some entity, either directly or indirectly (i.e., through an intermediary), in exchange for that entity’s performance of an induced abortion. Applying our holding, we determine that, because Norton did not allege that the State paid any entity for actually performing abortions, she did not state a claim for relief under section 50 and the trial court properly dismissed.her complaint. A. Section 50 Prohibits Only State Payments for a Specific Service 1Í11 Section 50 prohibits the State from spending public funds “to pay or otherwise reimburse, either directly or indirectly, any person, agency or facility for the performance of any induced abortion.” (Emphasis added.) Norton argues that the word “indirectly” prohibits the State from paying organizations that offer, abortion services — or entities closely affiliated with organizations that perform abortions — for any reason. Paying .these organizations for any service, she argues, subsidizes their abortion operations in violation of section 50. We disagree. Norton misinterprets the term “indirectly” and ignores the key phrase in section 50 that identifies the specific procedure that the State .is prohibited from paying for: “the performance of any induced abortion.” ¶12 Our resolution of this case turns on the meaning of the words “pay for” and “indirectly” in section 50. The phrase “pay ... for” in section 50 is a prepositional verb completed by its object, the phrase “the performance of any induced abortion.” Thus, the phrase “the performance . of any induced abortion” tells the State which specific service it cannot pay for. The preposition “for” means “in order to bring about or further,” or “in order to obtain.” For, Webster’s-Third New International Dictionary (unabr. ed. 2002). Therefore, the sentence “[n]o public funds shall be used by [the State] to pay ... [any entity] for the performance of any induced abortion” prohibits the State from paying public funds to any entity in order to “bring about” or “obtain” the performance of an induced abortion. Thus, section 50 focuses on the service that the State pays for in exchange for its money. Notably, Section 50 does not bar the State from contracting with an entire class of health care providers, although othpr states have adopted such provisions. For example, a statute in Indiana bars the Indiana state government from contracting with or making grants to “any entity that performs abortions or maintains or operates a facility where abortions are performed that involves the expenditure of state funds or federal funds administered by the state.” Ind. Code § 5-22-17-515 (2017). Section 50 does not go that far. Instead, it bars the State only from using public funds to pay for one specific medical service. ¶13 Norton nevertheless seizes upon the word “indirectly,” arguing that the State so paid Services Corp. for the performance of induced abortions by actually paying its affiliate, RMPP,' for non-abortion medical services. We disagree. ¶14 In Keim v. Douglas Cty. School Dist., 2017 CO 81, ¶ 32, 397 P.3d 377, 385, we held that the phrase “directly or indirectly,” as it relates to a provision within Colorado’s Fair Campaign Practices Act (“FCPA”), § 1-45-117(l)(a)(I), C.R.S. (2017), encompasses an intermediary theory. In that case, we interpreted the FCPA, which prohibits political subdivisions from making “contributions” in certain campaigns. Keim, ¶23, 397 P.3d at 382-83. The FCPA adopts the definition of “contribution” used in article XXVIII, section 2(5) of the Colorado Constitution. § 1-45-103(6)(a), C.R.S. (2017). Keim interpreted article XXVIII, section 2(5)(a)(IV), which defines “contribution” as “anything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate’s ... election.” Keim, ¶ 20, 397 P.3d at 382. We held that the phrase “directly or indirectly” in section 2(5)(a)(IV) modifies the contributor’s act of giving to the candidate, meaning a candidate may receive a thing of value in two ways: “directly” from the contributor or “indirectly” through one or more intermediaries. Id. at ¶ 28, 397 P.3dat 384. In either case, we held, the candidate must ultimately receive the thing of value given by the contributor. Id. Thus, in the FCPA context, “indirectly” refers to contributions that are actually received by the candidate, but arrive to that candidate through an intermediary. IcL ' ¶15 The- phrase “directly or indirectly” performs the same function -in section 50. Here, “directly or indirectly” modifies the State’s act of paying a health care provider for the performance of an abortion, meaning the State can violate section 50 in two ways: by paying some entity directly for performing an abortion, or by payirig an intermediary who then pays some entity for performing an abortion. In either case, the State must make the payment for the purpose 'of compensating a health care provider for performing an induced abortion. For example, section 50 prohibits the State from paying or reimbursing a physician for abortion care directly, e.g., writing a check to the physician to compensate them for performing that specific service. Section 50 also prohibits the State from paying a physician for abortion care through an intermediary such as a health maintenance organization (“HMO”).[3] ¶16 Accordingly, we hold that to state a claim for a violation of section 50, a complaint must allege that the State made a payment to a person or entity — whether directly to that person or entity, or indirectly through an intermediary — for the purpose of compensating them for performing an abortion and that such an abortion was actually performed. ¶17 Having reached this conclusion, we now consider whether Norton’s complaint stated a claim for relief. B. Norton’s Complaint Fails to State a Claim for Relief ¶18 As explained above, section 50 prohibits the State from paying public funds for a specific purpose — to obtain or bring about an abortion procedure. Therefore, even accepting the factual allegations in Norton’s complaint as true, her complaint does not state a claim for relief under section 50. Norton alleged that the State paid money to RMPP and that RMPP uses its income to subsidize the operations of Services Corp. But she did not allege that either RMPP or Services Corp. actually performed abortions in exchange for State funds. To the contrary, the trial court found that all of the funds the State paid to RMPP financed non-abortion medical procedures, including breast and cervical-cancer screenings. Norton argues that her subsidization theory is an indirect payment for an abortion, just like the HMO example, but the two are different in kind. In the HMO example, a physician provides an induced abortion in exchange for payment from the HMO, an account of State funds set aside for the purpose of paying medical expenses. In contrast, Norton did not allege that the State paid or reimbursed RMPP for actually'providing an abortion. Accordingly, the trial court properly dismissed Norton’s complaint for failure to state a claim. IV. Conclusion ¶19 For the foregoing reasons, we hold that the State does not violate section 50 when it pays RMPP for non-abortion medical services. To state a claim for relief under section 50, a plaintiff must allege that the State paid or reimbursed some entity, either directly or indirectly (through an intermediary), to provide an abortion. Because Norton did not allege that the State paid or reimbursed RMPP, directly or indirectly, for providing an abortion, the trial court properly dismissed her complaint under C.R.C.P. 12(b)(5). Accordingly, we affirm the judgment of the court of appeals. JUSTICE BOATRIGHT dissents, and' JUSTICE COATS joins in the dissent. . The trial court determined that only $1.4 million of the funds identified in Norton’s complaint were state funds. . We granted certiorari to review the following issue: 1. [REFRAMED] Whether the court of appeals erred in interpreting Colo. Const, art. ' V, section -50 to bar the use of state funds to.pay for the performance of any induced abortion only to the extent that the performance of an induced abortion is the purpose for which the state makes the payment. . As Colorado Attorney General Duane Woodard explained in a 1985 Advisory Opinion, section 50 prohibits the State from using public funds to pay the premium for an HMO that pays for abortion care as a benefit to State employees. Op. Att’y Gen., No. AD AC AGANY, 1985 WL 194202, at *2 (Feb. 6, 1985). By paying the premiums .to the HMO which, in turn, pays the medical provider for abortion procedures, the State indirectly pays for the performance of induced abortions. Id.