506 P.3d 84
2021 COA 144
BKP, INC., Ella Bliss Beauty Bar, L.L.C., Ella Bliss Beauty Bar 2, L.L.C., and Ella Bliss Beauty Bar 3, L.L.C., Plaintiffs-Appellants,
v.
KILLMER, LANE & NEWMAN, LLP, Mari Newman, and Towards Justice, Defendants-Appellees.
Court of Appeals No. 20CA0298
Colorado Court of Appeals, Division A.
Announced December 2, 2021
Sherman & Howard LLC, Raymond M. Deeny, Heather Fox Vickles, Brooke A. Colaizzi, Denver, Colorado, for Plaintiffs-Appellants
Treece Alfrey Musat P.C., Reza D. Rismani, Denver, Colorado; Killmer, Lane & Newman, LLP, Thomas Kelley, Denver, Colorado, for Defendants-Appellees Killmer, Lane & Newman, and Mari Newman
The Law Office of Brian D. Gonzales, Brian D. Gonzales, Fort Collins, Colorado; Harter Secrest & Emery LLP, Brian M. Feldman, Rochester, New York, for Defendant-Appellee Towards Justice
Opinion by CHIEF JUDGE BERNARD
¶ 1 The plaintiffs in this case, BKP, Inc., Ella Bliss Beauty Bar, L.L.C., Ella Bliss Beauty Bar 2, L.L.C., and Ella Bliss Beauty Bar 3, L.L.C., which we shall collectively call "the employer," filed a lawsuit against defendants, an attorney named Mari Newman and two law firms, Kilmer, Lane & Newman, LLP, and Towards Justice, which we shall cumulatively refer to as "the attorneys." The trial court granted the attorneys’ C.R.C.P. 12(b)(5) motions to dismiss the lawsuit. The employer appeals. We affirm in part, we reverse in part, and we remand the case to the trial court for further proceedings.
I. Background
¶ 2 In May 2018, the attorneys filed a class action lawsuit in federal court on behalf of a nail technician — a person who does manicures and pedicures — who had worked for the employer. The members of the putative class were other nail technicians who had also worked for the employer. The complaint alleged that the employer had violated various wage and employment laws. On the same day, during a press conference announcing the federal lawsuit, Ms. Newman made four allegedly false statements:
1. "For no pay whatsoever, [the nail technicians] have to clean the business, including the bathrooms, because [the employer] is simply too cheap to pay its workers the money they deserve."
2. "Instead of paying the [nail technicians] for every hour that they work, [the employer] pick[s] and choose[s] and only pay[s] for the hours [it] feel[s] like paying."
3. "It is time for businesses to quit financially exploiting women. Oppression of vulnerable workers remains all too common, and this is a particularly audacious case."
4. "It's fairly common in industries that employ populations they think they can take advantage of, like women or immigrants."
¶ 3 Along with the press conference, the attorneys issued a press release that contained, in addition to the third statement above, the allegedly false statement that "[the employer] forced its [nail] technicians to perform janitorial work without pay, refused to pay overtime, withheld tips, and shorted commissions."
¶ 4 About one year after these statements were made, the employer sued the attorneys, asserting that the four statements in the press conference and the statements in the press release amounted to both defamation and intentional interference with contractual relations.
¶ 5 The attorneys asked the trial court to dismiss the claims under C.R.C.P. 12(b)(5), arguing that the statements were not actionable 506 P.3d 89 as defamation because they were either (1) subject to the litigation privilege, which we describe below; (2) protected by the Noerr-Pennington doctrine, which we also describe below; or (3) opinions protected by the First Amendment.
¶ 6 In a written order, the trial court granted the attorneys’ motions to dismiss. With respect to the press conference, the court decided that part of the first statement that Ms. Newman made — "For no pay whatsoever, they have to clean the business, including the bathrooms" — and the second statement she made were protected by the Noerr-Pennington doctrine. It then ruled that the latter part of Ms. Newman's first statement — "[The employer] is simply too cheap to pay its workers the money they deserve" — along with the third and fourth statements were protected by the First Amendment because they were opinions, not statements of fact. Last, the court determined that one statement in the press release — "It is time for businesses to quit financially exploiting women. Oppression of vulnerable workers remains all too common, and this is a particularly audacious case"— was protected by the First Amendment because it was an opinion; and that the other statement in the press release — "[The employer] forced its [nail] technicians to perform janitorial work without pay, refused to pay overtime, withheld tips, and shorted commissions." — was protected by the Noerr-Pennington doctrine.
¶ 7 As for the employer's intentional interference with contractual relations claim, the court dismissed it too, concluding that (1) the allegations were conclusory; and (2) there were no actionable defamation allegations that could form the basis for the claim.
II. C.R.C.P. 12(b)(5) Motions ¶ 8 A C.R.C.P. 12(b)(5) motion to dismiss for failure to state a claim upon which relief can be granted tests the formal sufficiency of a plaintiff's complaint. Allen v. Steele , 252 P.3d 476, 481 (Colo. 2011). Such motions are looked upon with disfavor, id. , and we review decisions to grant them de novo, applying the same standards as the trial court, Denver Post Corp. v. Ritter , 255 P.3d 1083, 1088 (Colo. 2011). ¶ 9 When deciding whether to grant a motion to dismiss, a trial court must accept all the allegations of material fact as true, and it must look at them in the light most favorable to the plaintiff. Allen , 252 P.3d at 481. On review, we may consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, and matters proper for judicial notice. Norton v. Rocky Mountain Planned Parenthood, Inc. , 2018 CO 3, ¶ 7, 409 P.3d 331. To avoid being dismissed for failure to state a claim, "a party must plead sufficient facts [in the complaint] that, if taken as true, suggest plausible grounds to support a claim for relief." Patterson v. James , 2018 COA 173, ¶ 23, 454 P.3d 345 (citing Warne v. Hall , 2016 CO 50, ¶ 24, 373 P.3d 588 ).
III. Analysis
A. The Litigation Privilege ¶ 10 We start with the litigation privilege. The trial court's order did not address the attorneys’ litigation privilege argument. But both sides discussed it in their trial court briefs, the attorneys submit in their answer brief that the litigation privilege controls the outcome of this case, and the employer addresses that submission in its reply brief.
¶ 11 "[W]e are in as good a position as the trial court to assess the viability of [the] complaint." Hemmann Mgmt. Servs. v. Mediacell, Inc. , 176 P.3d 856, 859 (Colo. App. 2007). We therefore do not need to remand this case to the trial court to resolve this issue; rather, we can resolve it as a matter of law. See W.O. Brisben Cos., Inc. v. Krystkowiak , 66 P.3d 133, 137 (Colo. App. 2002) (analyzing sufficiency of complaint for the first time on appeal), aff'd on other grounds , 90 P.3d 859 (Colo. 2004). ¶ 12 Whether the litigation privilege applies is a question of law. Club Valencia Homeowners Ass'n v. Valencia Assocs. , 712 P.2d 1024, 1027 (Colo. App. 1985). We review the resolution of questions such as these de novo. Belinda A. Begley & Robert K. Hirsch Revocable Tr. v. Ireson , 2020 COA 157, ¶ 12, 490 P.3d 963 ( Begley II ).
506 P.3d 90 ¶ 13 We begin our analysis by asking: What is the litigation privilege?
¶ 14 As a division of this court explained in Club Valencia , 712 P.2d at 1027, Colorado adheres to the description of the privilege found in Restatement (Second) of Torts § 586 (Am. L. Inst. 1977). Section 586 provides that
1. a lawyer "is absolutely privileged to publish defamatory matter" about another person or party;
2. "in communications preliminary to a proposed judicial proceeding"; or
3. "in the institution of, or during the course and as a part of, a judicial proceeding" in which the lawyer participates as counsel;
4. "if it has some relation to the proceeding." ¶ 15 "The purpose of this privilege ... is to afford litigants the utmost freedom of access to the courts to preserve and defend their rights and to protect attorneys during the course of their representation of clients." Club Valencia , 712 P.2d at 1027. As California's Supreme Court has explained, "[i]t is not difficult to imagine the consequences likely to follow in the wake of a rule permitting the defendant in a civil action to institute parallel litigation seeking to impose liability" on the plaintiff's lawyer. Rubin v. Green , 4 Cal.4th 1187, 17 Cal.Rptr.2d 828, 847 P.2d 1044, 1050 (1993). Those adverse consequences include impairing colorable claims by "disrupting access to counsel," intimidating counsel with "an almost certain retaliatory proceeding," distracting counsel by forcing counsel to "defend[ ] a personal countersuit" as well as the original lawsuit, and "dampening ... the unobstructed presentation of claims." Id. ¶ 16 But the privilege has limits. "To be privileged, the alleged defamatory matter must have been made in reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it." Club Valencia , 712 P.2d at 1027. And "the maker of the statement and the recipient must be involved in and closely connected with the proceeding." Id. At the same time, "[n]o strained or close construction will be indulged to exempt a case from the protection of privilege." Id. at 1027-28.
¶ 17 Over the ensuing years, divisions of this court have refined the doctrine.
¶ 18 Significantly, in Buckhannon v. U.S. West Communications, Inc. , 928 P.2d 1331, 1335 (Colo. App. 1996), the division held that the privilege "not only shields attorneys from defamation claims arising from statements made during the course of litigation, but it also bars other non-defamation claims that stem from the same conduct." Id.
¶ 19 Five years later, in Merrick v. Burns, Wall, Smith & Mueller, P.C. , 43 P.3d 712, 714 (Colo. App. 2001), the division clarified that the absolute immunity afforded by the litigation privilege "extends only to those functions intimately related and essential to the judicial decision-making process." And, as for "[c]ommunications preliminary to a judicial proceeding[, such] are protected by absolute immunity only if they have some relation to a proceeding that is actually contemplated in good faith." Id. ; see also Restatement (Second) of Torts § 586 cmt. e.
¶ 20 Then, in Begley v. Ireson , 2017 COA 3, 399 P.3d 777 ( Begley I ), the division distinguished prelitigation statements from statements made "after litigation ha[s] commenced or contemporaneously with the filing of a lawsuit," holding, consistently with Merrick , that the litigation privilege only attaches to prelitigation statements that relate to prospective litigation that is contemplated in good faith. Id. at ¶¶ 16-18. In imposing the good faith requirement, the division explained it was wary of creating a rule that permitted "an attorney [to] make a statement that tortiously interfered with a contract and then cloak it in the privilege by subsequently filing a bad faith and meritless claim related to the otherwise tortious statement." Id. at ¶ 16.
¶ 21 Most recently, in Begley II , 2020 COA 157, 490 P.3d 963, the division concluded that statements need not be defamatory to be shielded by the litigation privilege, noting that "[a]lthough the privilege was created to protect [litigants] from liability for defamatory communications, it has been applied more 506 P.3d 91 broadly to immunize nondefamatory conduct." Id. at ¶ 21 (citation omitted).
¶ 22 Although the court of appeals’ decisions discussed above covered considerable ground, no Colorado case has considered whether the litigation privilege should extend to statements made during press conferences or in press releases that occur or are issued after litigation has begun. We look to decisions from other states that have addressed those circumstances for guidance. See, e.g. , id. at ¶ 24 ("[W]e note that applying the litigation privilege to shield nondefamatory litigation conduct is consistent with decisions from other jurisdictions.").
¶ 23 Some decisions refuse to extend the privilege to what they call "litigating in the press," or they focus on how widely the statements are disseminated. This means that attorneys who make statements during press conferences, in press releases, and on social media do so at their own risk. Rothman v. Jackson , 49 Cal.App.4th 1134, 57 Cal. Rptr. 2d 284, 294 (1996) (no privilege for press conferences or press releases); GetFugu, Inc. v. Patton Boggs LLP , 220 Cal.App.4th 141, 162 Cal. Rptr. 3d 831, 840 (2013) (no privilege for social media posts); see also Barto v. Felix , 250 Pa.Super. 262, 378 A.2d 927, 930 (1977) (an attorney's press conference remarks "did not fall within the sphere of activities [the] immunity was designed to protect"); Kennedy v. Zimmermann , 601 N.W.2d 61, 66 (Iowa 1999) ("[C]omments to a newspaper reporter following the filing of a lawsuit are not part of the judicial proceeding protected by the absolute privilege."); Williams v. Kenney , 379 N.J.Super. 118, 877 A.2d 277, 290-91 (N.J. Super. Ct. App. Div. 2005) (separating "bona fide litigation activities" from "public relations campaign[s]"); Pratt v. Nelson , 2007 UT 41, ¶¶ 40, 46, 164 P.3d 366 (no privilege for statements made during a press conference because the statements were "excessively published," meaning they "were published to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation"); Ball v. D'Lites Enters., Inc. , 65 So. 3d 637, 639-40 (Fla. Dist. Ct. App. 2011) (analogizing statements published on a website to statements made during a press conference and concluding that the statements were not privileged for want of a connection with judicial proceedings). But see Prokop v. Cannon , 7 Neb.App. 334, 583 N.W.2d 51, 58 (1998) (statements to the media were "well within the privilege").
¶ 24 Other states, meanwhile, apply the privilege on a case-by-case basis. See Brown v. Gatti , 195 Or.App. 695, 99 P.3d 299, 305 (2004) (determining post-trial statements to the press were not privileged as they were not made "in connection" with a judicial proceeding, but noting there may be situations in which an attorney's statements to the press could qualify for absolute immunity), aff'd in part and rev'd in part on other grounds , 341 Or. 452, 145 P.3d 130 (2006) ; Landry's, Inc. v. Animal Legal Def. Fund , 566 S.W.3d 41, 60 (Tex. App. 2018) (recognizing a split of authority in the state "about whether the judicial-proceedings privilege applies to press releases or statements to the press"), aff'd in part and rev'd in part , 631 S.W.3d 40 (Tex. 2021).
¶ 25 Only a handful of states have considered the question before us now: If we assume that the litigation privilege does not generally apply to statements made during press conferences and in press releases, should an exception be made for class action lawsuits? One state, Arizona, has answered the question "no," while three others, Tennessee, Maryland, and New Mexico, have said "yes." We examine these cases next.
¶ 26 Green Acres Trust v. London , 141 Ariz. 609, 688 P.2d 617, 619-20 (1984), arose out of a meeting that a group of lawyers held with potential plaintiffs to review a class action complaint that they were drafting against a funeral home for engaging in allegedly deceptive sales practices. One of the lawyers invited a newspaper reporter to attend the meeting, where the lawyers provided the reporter with a copy of the complaint and spoke with her about the case. Id. at 620. As a result, the reporter wrote an article that included allegations that the funeral home (1) was under investigation by the state attorney general's office; (2) had "bilked" up to five thousand people; (3) had deliberately violated state laws; and (4) had "intentionally inflicted emotional distress on its victims." Id. The 506 P.3d 92 funeral home then sued the lawyers for defamation. Id.
¶ 27 On appeal, the Arizona Supreme Court decided that the litigation privilege did not apply to the statements that the lawyers had made to the reporter. The court reasoned that "authorities generally conclude that since publication to the news media lacks a sufficient relationship to judicial proceedings, it should not be protected by an absolute privilege." Id. at 622 (citing Asay v. Hallmark Cards, Inc. , 594 F.2d 692, 697 (8th Cir. 1979) ). More to the point, the court explained that "the recipient of the communications, the newspaper reporter, had no relation to the proposed class action. [She] played no role in the actual litigation other than that of a concerned observer. ... The press conference simply did not enhance the judicial function ...." Id. at 622-23.
¶ 28 The next case to contend with the issue was Simpson Strong-Tie Co. v. Stewart, Estes & Donnell , 232 S.W.3d 18, 20 (Tenn. 2007), which concerned a newspaper advertisement that a law firm had posted to solicit potential plaintiffs in a case against a manufacturing company for allegedly producing faulty deck screws and fasteners. Id. The firm posted a corresponding announcement on its website. Id. at 21. The company then sued the firm for defamation. Id.
¶ 29 Noting the centuries-old, common law roots of the litigation privilege, the Tennessee Supreme Court concluded that both the advertisement and announcement were protected as communications soliciting clients that had been made before a case was filed. Id. at 24. The court observed that, "[i]n some situations, attorneys may have no practical means of discerning in advance whether the recipients of the communication have an interest in the proposed proceeding." Id. at 26. "In that event," the court continued, "the attorney can only communicate with those having the ability and desire to join the proposed litigation by publishing the statement to a wider audience, which may include unconnected individuals." Id.
¶ 30 Recognizing that excessive publication of statements could be problematic, however, the court imposed the following limitation: "[I]f the attorney has a feasible way of discerning which recipients have an interest in the case, but nevertheless publishes the defamatory communication to those having no interest in the case, the privilege would not apply." Id.
¶ 31 Last, the court noted that suing lawyers for defamation is not the only way to hold them accountable for making false and defamatory statements. Id. at 27. "For example," the court continued, a lawyer whose statements "result in a baseless lawsuit" may face a malpractice action, a malicious prosecution action, or both; the lawyer could face sanctions for violating Tennessee's version of C.R.C.P. 11 ; and the lawyer could be disciplined under the state's rules of professional conduct "for violating ethical requirements which prohibit the filing of frivolous claims or soliciting employment by means of fraud or false or misleading statements." Id.
¶ 32 Maryland took up the issue in Norman v. Borison , 418 Md. 630, 17 A.3d 697, 702-703 (2011), a case concerning some lawyers’ allegedly defamatory circulation of a class action complaint and the allegedly defamatory statements that the lawyers had made to the press about the lawsuit. As is relevant to our case, the Maryland Court of Appeals determined that the lawyers’ statements to the press — calling the defendants "bad people" and "vultures" and claiming that one of the defendants "was out stealing the equity in people's homes and on top of that, getting it tax free" — were protected by the litigation privilege, adding that "it appears [that the lawyers] made the statements while promoting public awareness of their proposed class action claim and, thus, while participating in the course of the proceeding." Id. at 717.
¶ 33 The court also explained that the newspaper articles containing the allegedly defamatory statements "provided readers (i.e. , possible class members) with details about how the mortgage rescue scam worked, when it took place, who was involved ..., and who was targeted." Id. Accordingly, the court reasoned that lawyers should be allowed to engage in the "public promotion" of class action lawsuits before the class is certified, so long as "framing the suit as a 506 P.3d 93 ‘class action’ ... is not shown to have been a subterfuge for funneling defamatory statements to the press." Id. at 718. Distinguishing Kennedy v. Cannon , 229 Md. 92, 182 A.2d 54, 58 (1962) ("[A]n attorney who wishes to litigate his case in the press will do so at his own risk"), the court wrote, "lawyers who try their cases in the media do so at some peril," Norman , 17 A.3d at 718 (emphasis added).
¶ 34 The most recent decision to discuss this issue is Helena Chemical Co. v. Uribe , 281 P.3d 237 (N.M. 2012). As told by the New Mexico Supreme Court, the case began with a community meeting about environmental and health hazards allegedly caused by a chemical company. Id. at 240. Two lawyers and a political blogger were invited to attend. Id. During the meeting, one of the attorneys said that children were "at a much greater risk" and the company's actions appeared to be "pretty egregious." Id. The blogger wrote about the meeting on his website. Id. Ten months later, the lawyers filed suit against the company. Id. The next day, they held a press conference, during which the same lawyer who spoke at the meeting asserted that "[t]he underground water has been contaminated." Id. The company sued the lawyer for defamation. Id. at 240-41.
¶ 35 On appeal, the court held that all of the lawyer's statements — both during the community meeting and during the press conference — were protected by the litigation privilege. Id. at 242-46. Generally, the court explained, "we agree with those [jurisdictions] that have held that the absolute privilege may apply to statements made to the press." Id. at 244. Citing favorably to Norman and Simpson Strong-Tie Co. , the court observed that, "[i]n the context of class action or mass-tort litigation, the most economical and feasible method of informing potential litigants of prospective litigation affecting their interests may be through the press." Id. at 245. As a result, the "use of the press as a conduit to communicate with additional potential class action or mass-tort litigants may be reasonably related to the object of the contemplated judicial proceeding." Id.
¶ 36 With respect to the lawyer's press conference statement, the New Mexico Supreme Court concluded that it was privileged because it repeated the allegations of the complaint. Id. at 246-47. "Moreover," the court continued, the statement "furthered the object of this mass-tort litigation by educating others in the affected community about the need for and availability of legal representation." Id. at 247.
¶ 37 The attorneys in this case rely on this trio of cases — Simpson Strong-Tie Co. , Norman , and Helena Chemical Co. — to contend that their statements are protected by the litigation privilege. For the purposes of resolving this appeal, we will assume, without deciding, that, even if Colorado were one of the states that would generally deny the litigation privilege to any and all statements that lawyers make to the press, see Rothman , 57 Cal. Rptr. 2d at 294, these three cases would create a narrow exception to that general rule for some statements concerning class action cases. We will therefore consider the attorneys’ contention in the context that they propose. But, even when viewing the issue in this context, we nonetheless conclude that the statements made during the press conference and in the press release are not protected by the litigation privilege.
¶ 38 We first see that the statements that Ms. Newman made during the press conference and those contained in the press release were made after the class action case had been filed. In other words, there is no question that the comments were made in connection with a pending lawsuit.
¶ 39 Importantly, the attorneys write in their answer brief that their purpose in speaking to the press was to "allow[ ] [them] to promote their class action and potentially reach other ... nail technicians" who had worked for the employer. "Those ... workers," the attorneys continue, "could join the suit as class members or additional class representatives, step forward as witnesses, or pursue the claims themselves outside the class action." As a result, the attorneys finish up, the statements to the press "promoted the class action, as the litigation privilege gives them freedom to do." Said differently, according to the attorneys, their purpose in 506 P.3d 94 speaking with the press and issuing the press release was to reach nail technicians who had worked for the employer.
¶ 40 Yet the complaint in the federal lawsuit undermines the need to engage in that form of communication. The part of the complaint setting out the nail technicians’ reasons for why the case should be certified as a class action stated that "[t]he class is so numerous that joinder of all potential class members is impracticable." "Plaintiff," the complaint continued, "does not know the exact size of the class since that information is within the control of [the employer]." So far, so good. ¶ 41 Crucially, however, the complaint "estimates that, based on the size of [the employer's] operations, the class is composed of well over 80 persons." It adds that "[t]he exact size of the class will be easily ascertainable from [the employer's] records" and that "[t]he contours of the class will be easily defined by reference to the payroll documents [the employer was] legally required to create and maintain." (Emphasis added.) In other words, the complaint admits that identifying the members of the class would be easy.
¶ 42 Relying on Simpson Strong-Tie Co. , 232 S.W.3d at 26, we conclude that the privilege does not apply in this case because the attorneys had a "feasible way" of figuring out who in their audience had an interest in the case: according to the complaint in the federal lawsuit, finding the nail technicians who had an interest in this case would be "easy." But they nevertheless broadly published the allegedly defamatory communications to those having no interest in the case.
¶ 43 As for Norman , the Maryland Court of Appeals noted that, for lawyers, "we ... require ... the defamatory statement have some rational relation to the matter at bar before unfurling the umbrella of absolute privilege." 17 A.3d at 709. In this case, the attorneys contend that the relationship between their statements and this case was to "promote" the class action to reach nail technicians who had worked for the employer. But, again, the complaint in the federal lawsuit undercuts that assertion. And, if discovering the identities of all the potential members of the class was going to be "easy," then there was no rational reason to make the statements to the general public.
¶ 44 Last, the New Mexico Supreme Court observed in Helena Chemical Co ., ¶ 35, that a lawyer's statement during a press conference "furthered the object" of the case "by educating others in the affected community about the need for and availability of legal representation." In this case, in contrast, there was no need to educate potential class members through the press when, to reiterate, the members of the class for the federal lawsuit would be "easy" to identify.
¶ 45 We therefore conclude that the three cases upon which the attorneys rely do not support their position, at least at this stage of the proceedings, in which we are limited to considering the complaint, any attachments to the complaint, and any matters about which we could take judicial notice. See Norton , ¶ 7.
B. The Noerr-Pennington Doctrine ¶ 46 The Noerr-Pennington doctrine is named for two United States Supreme Court cases, Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc. , 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington , 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Whether the doctrine applies in this context is a question of law. IGEN Int'l Inc. v. Roche Diagnostics GmbH , 335 F.3d 303, 310 (4th Cir. 2003) ; Trs. of Univ. of Pa. v. St. Jude Child.’s Rsch. Hosp. , 940 F. Supp. 2d 233, 241-43 (E.D. Pa. 2013) (a court may decide whether Noerr-Pennington applies under Fed. R. Civ. P. 12(b)(6) if no factual issues are present); Rogers v. Dupree , 340 Ga.App. 811, 799 S.E.2d 1, 8 (2017). We review questions of law de novo. Begley II , ¶ 12.
¶ 47 As we explain below, we conclude that there are two reasons why the doctrine does not apply in this case to shield the attorneys from liability. ¶ 48 Under the First Amendment, one has the right to petition the government to redress grievances. In contrast to 506 P.3d 95 the right to free speech, which "fosters the public exchange of ideas that is integral to deliberative democracy," the right to petition "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." Borough of Duryea v. Guarnieri , 564 U.S. 379, 388, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011). Putting a finer point on it, "[a] petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." Id. at 388-89, 131 S.Ct. 2488 ; accord McDonald v. Smith , 472 U.S. 479, 486, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (Brennan, J., concurring)("The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances."(quoting United States v. Cruikshank , 92 U.S. 542, 552, 23 L.Ed. 588 (1876) )).
¶ 49 In light of this right, the Court in Noerr held that a business's publicity campaign in support of the passage of certain types of legislation was petitioning activity immune from antitrust liability under the Sherman Act, even though the legislation might harm the business's competitors. 365 U.S. at 138-39, 81 S.Ct. 523. Then, in Pennington , the Court decided that "[j]oint efforts to influence public officials," even if designed to destroy competition, were, consistent with Noerr , immune from antitrust liability. 381 U.S. at 670, 85 S.Ct. 1585. The Court then extended the doctrine in California Motor Transport Co. v. Trucking Unlimited , 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), when it reasoned that "[t]he same philosophy [undergirding Noerr and Pennington ] governs the approach of citizens or groups of them to administrative agencies ... and to courts," and, therefore, concluded that "[t]he right of access to the courts is indeed but one aspect of the right of petition." ¶ 50 Over the past fifty-plus years, there has been considerable debate about the extent of the doctrine's applicability, and many related questions are yet unresolved. See, e.g. , Boyer v. Health Grades, Inc. , 2015 CO 40, ¶¶ 14-15, 359 P.3d 25. The United States Supreme Court made at least one thing clear: the doctrine applies only to conduct "aimed at influencing decisionmaking by the government." Octane Fitness, LLC v. ICON Health & Fitness, Inc. , 572 U.S. 545, 555-56, 134 S.Ct. 1749, 188 L.Ed.2d 816 (2014). And this tracks with decisions of our supreme court. See Boyer , ¶¶ 14-15 ; Gen. Steel Domestic Sales, LLC v. Bacheller , 2012 CO 68, ¶ 3, 291 P.3d 1 ; Protect Our Mountain Env't, Inc. v. Dist. Ct. , 677 P.2d 1361, 1365 (Colo. 1984). ¶ 51 When analyzing limits on the doctrine's reach, we see that it not only protects statements made in litigation, but it also protects conduct that is incidental to the prosecution of a lawsuit. Columbia Pictures Indus., Inc. v. Pro. Real Estate Invs., Inc. , 944 F.2d 1525, 1528-29 (9th Cir. 1991), aff'd , 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ; accord Sosa v. DIRECTV, Inc. , 437 F.3d 923, 935 (9th Cir. 2006). But conduct that is "incidental" to the prosecution of a lawsuit "does not mean conduct ‘in any way related’ to a lawsuit." Wisk Aero LLC v. Archer Aviation Inc. , No. 3:21-CV-02450-WHO, 2021 WL 4932734, *7 (N.D. Cal. Sept. 14, 2021). On the one hand, "[a] publicity campaign directed at the general public, seeking legislation or executive action, enjoys ... immunity even when the campaign employs unethical and deceptive methods." Allied Tube & Conduit Corp. v. Indian Head, Inc. , 486 U.S. 492, 499-500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). On the other hand, "in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result" in liability. Id. at 500, 108 S.Ct. 1931. ¶ 52 In this case, the statements made at the press conference and in the press release merely described the federal lawsuit without advancing the nail technicians’ interest in it; the statements and the press release were simply a means of publicizing it. As a result, they were not incidental to prosecuting it. See Wisk Aero LLC , 2021 WL 4932734, at *8 (Blog posts and a press release were not incidental to prosecuting a lawsuit because they "communicated with the public about the lawsuit. But they did not, in 506 P.3d 96 any manner, affect it or advance [the party's] interests in it.").
¶ 53 As we have explained above when discussing the litigation privilege, potentially subjecting the attorneys to liability would not hamper the nail technicians’ ability to locate potential class action members. See id. at *9 n.7 (observing that the outcome of the case would be different if "the blog post or press release served some purpose in the litigation," such as being "part of a class action notice plan, a search for class members, a search for witnesses, or something similar"); Arista Networks, Inc. v. Cisco Sys., Inc. , No. 16-CV-00923-BLF, 2018 WL 11230167, *11 (N.D. Cal. May 21, 2018) (holding that communications had no relationship to the prosecution of a lawsuit because they were merely "statements about the status of the parties’ litigation and [one party's] intellectual property rights"); see also Theofel v. Farey-Jones , 359 F.3d 1066, 1079 (9th Cir. 2004) ("Subpoenaing private parties in connection with private commercial litigation bears little resemblance to the sort of governmental petitioning the [Noerr-Pennington ] doctrine is designed to protect."); Luxpro Corp. v. Apple, Inc. , 658 F. Supp. 2d 921, 929 (W.D. Ark. 2009) (The defendant "has not shown that its post-litigation conduct of sending warning letters, making threats, and exerting pressure on [the plaintiff's] clients were incidental to the prosecution of the foreign litigation.").
¶ 54 We therefore conclude that part of the first statement that Ms. Newman made during the press conference — "For no pay whatsoever, they have to clean the business, including the bathrooms" — and the second statement made during the press conference — "Instead of paying the [nail technicians] for every hour that they work, [the employer] pick[s] and choose[s] and only pay[s] for the hours [it] feel[s] like paying." — along with one statement made in the press release — "[The employer] forced its [nail] technicians to perform janitorial work without pay, refused to pay overtime, withheld tips, and shorted commissions" — were not incidental to the prosecution of the federal lawsuit.
¶ 55 But even if the statements were incidental to the prosecution of the federal lawsuit, we are also unconvinced that the Noerr-Pennington doctrine applies to defamation lawsuits, such as the one that the employer has filed in this case.
¶ 56 As explained in Boyer , our supreme court has relied on the Noerr-Pennington doctrine "both for the proposition that the right to petition the government has been applied to immunize from legal liability in subsequent litigation various forms of administrative and judicial petitioning activity, and for the proposition that this right to petition is not without limits." Boyer , ¶ 9. ¶ 57 Looking to those limits, "[t]he First Amendment does not grant a license to use the courts for improper purposes." Protect Our Mountain Env't, Inc. , 677 P.2d at 1366. "Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." Bill Johnson's Rests., Inc. v. NLRB , 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). ¶ 58 In this regard, the First Amendment does not absolutely protect defamatory speech. Gertz v. Robert Welch, Inc. , 418 U.S. 323, 340-41, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[T]here is no constitutional value in false statements of fact." But "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters."). This is so because one's right to the protection of one's reputation "from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty." Rosenblatt v. Baer , 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).
¶ 59 We now turn to the intersection of the Noerr-Pennington doctrine and defamation claims. In Smith v. McDonald , 737 F.2d 427, 427 (4th Cir. 1984), a litigant asserted that the Noerr-Pennington doctrine immunized him from liability for libel. The circuit court disagreed. After deciding to review the case, the United States Supreme Court disagreed 506 P.3d 97 too and affirmed the circuit court's opinion, explaining that "[t]he right to petition is guaranteed; the right to commit libel with impunity is not." McDonald , 472 U.S. at 485, 105 S.Ct. 2787.
¶ 60 Before the Supreme Court decided McDonald , at least two states had decided that the Noerr-Pennington doctrine barred defamation claims. Bass v. Rohr , 57 Md.App. 609, 471 A.2d 752, 758 (1984) ; Webb v. Fury , 167 W.Va. 434, 282 S.E.2d 28, 43 (1981). But, after McDonald , these states reversed course, concluding that the doctrine did not apply to such claims. Miner v. Novotny , 304 Md. 164, 498 A.2d 269, 272 (1985) (overruling Bass ); Harris v. Adkins , 189 W.Va. 465, 432 S.E.2d 549, 552 (1993) (overruling Webb ).
¶ 61 A significant number of post- McDonald cases conclude that the Noerr-Pennington doctrine does not bar defamation claims. See Whelan v. Abell , 48 F.3d 1247, 1254-55 (D.C. Cir. 1995) (The court declined to apply the Noerr-Pennington doctrine because "[w]e see no reason to believe that the right to petition includes a right to file deliberately false complaints," and "[h]owever broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods."); St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am. , 795 F.2d 948, 955 (11th Cir. 1986) (stating that misrepresentations to a governmental agency do not qualify for immunity under the Noerr-Pennington doctrine); In re IBP Confidential Bus. Documents Litig. , 755 F.2d 1300, 1313 (8th Cir. 1985) ("Noerr-Pennington does not necessarily and absolutely preclude liability for damages resulting from defamatory statements made in the course of petitioning the government."); Chevalier v. Animal Rehab. Ctr., Inc. , 839 F. Supp. 1224, 1236 (N.D. Tex. 1993) (relying on McDonald to conclude that, because the Noerr-Pennington doctrine relies on the First Amendment's right to petition, that clause "poses no barrier" to a defamation claim "so long as the added safeguard of actual malice is in place"); Blount v. Stroud , 395 Ill.App.3d 8, 333 Ill.Dec. 854, 915 N.E.2d 925, 948 (2009) ("Illinois courts have ... concluded that the first amendment right to petition and the Noerr-Pennington doctrine do not provide a defendant with additional protection from liability for defamation."). ¶ 62 We recognize that some post- McDonald courts have decided to grant immunity against defamation claims, and they have discussed the Noerr-Pennington doctrine in doing so. See Brownsville Golden Age Nursing Home, Inc. v. Wells , 839 F.2d 155, 159-60 (3d Cir. 1988) ; Eaton v. Newport Bd. of Educ. , 975 F.2d 292, 298 (6th Cir. 1992) ; Cheminor Drugs, Ltd. v. Ethyl Corp. , 168 F.3d 119, 128-29 (3d Cir. 1999). But "[n]one of the[se] cases ... hold that the Noerr-Pennington doctrine is on its own a defense against a defamation claim." S. Middlesex Opportunity Council, Inc. v. Town of Framingham , 752 F. Supp. 2d 85, 121 (D. Mass. 2010). Rather, "[a]lthough considerable First Amendment interests are relevant to defamation law, they do not provide immunity for defamatory statements." Id. ¶ 63 Turning to this case, the first claim in the employer's complaint is for defamation per se/per quod. The second claim is for intentional interference with contractual relations, but it is based on the defamation claim: "the attorneys, by means of their defamatory statements ," intentionally caused employees and customers "to terminate their contracts" with the employer. (Emphasis added.) Because the two claims are grounded solely on defamation, we conclude that the Noerr-Pennington doctrine does not apply to insulate the attorneys from them. See, e.g. , McDonald , 472 U.S. at 484, 105 S.Ct. 2787 ; In re IBP Confidential Bus. Documents Litig. , 755 F.2d at 1313 ; Chevalier , 839 F. Supp. at 1236 ; Blount , 333 Ill.Dec. 854, 915 N.E.2d at 948.
C. Opinion
¶ 64 We next address whether certain statements that Ms. Newman made during the press conference were opinions protected by the First Amendment. ¶ 65 The issue of whether a statement is defamatory is a question of law that we review de novo. Zueger v. Goss , 2014 COA 61, ¶ 14, 343 P.3d 1028. "[B]ecause the threat of protracted litigation could have a chilling effect on the constitutionally protected 506 P.3d 98 right of free speech, prompt resolution of defamation actions, by summary judgment or motion to dismiss, is appropriate." Fry v. Lee , 2013 COA 100, ¶ 24, 408 P.3d 843. ¶ 66 To determine whether a statement is defamatory, courts ask two questions. Keohane v. Stewart , 882 P.2d 1293, 1299 (Colo. 1994). First, "is ... the statement ... ‘sufficiently factual to be susceptible of being proved true or false?’ " Id. (quoting Milkovich v. Lorain J. Co. , 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) ). Second, would "reasonable people ... conclude that the assertion is one of fact?" Id. ¶ 67 To answer the second question, we consider "how the assertion is phrased"; "the context of the entire statement"; and "the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed." Id. ; see also Milkovich , 497 U.S. at 21, 110 S.Ct. 2695 (concluding that figurative, hyperbolic, or loose language may indicate that statements should not be viewed as assertions of fact). "[A]n expression of belief or opinion that does not imply the existence of a false and defamatory fact is constitutionally privileged" under the First Amendment. Zueger , ¶ 19 ; see Lawson v. Stow , 2014 COA 26, ¶ 30, 327 P.3d 340.
¶ 68 We discover similar reasoning in the Restatement (Second) of Torts § 566 (Am. L. Inst. 1977), which states that "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."
¶ 69 Comment b to section 566 informs our analysis. It states that there are "two kinds of expression of opinion." Id. at cmt. b. One is "the pure type," which "occurs when the maker of the comment states the facts on which he bases his opinion ... and then expresses a comment as to [a person's or organization's] conduct, qualifications or character." Id. The second kind is the "mixed type," which occurs when "an opinion in form or context, is apparently based on facts regarding [a person's or organization's] conduct that have not been stated by the [speaker] or assumed to exist by the parties to the communication." Id. As a result, a mixed type opinion "gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by [the speaker]." Id.
¶ 70 Comment c to section 566 adds that "[a] simple expression of opinion based on disclosed or assumed nondefamatory facts" — or an opinion of the "pure type" — is not itself sufficient for an action of defamation, "no matter how unjustified and unreasonable the opinion may be or how derogatory it is."
¶ 71 The trial court decided that three statements from the press conference — part of the first, all of the third, and all of the fourth — were protected opinions. To remind the reader:
• The first statement was: "For no pay whatsoever, [the nail technicians] have to clean the business, including the bathrooms, because [the employer] is simply too cheap to pay its workers the money they deserve."
• The third statement was: "It is time for businesses to quit financially exploiting women. Oppression of vulnerable workers remains all too common, and this is a particularly audacious case."
• The fourth statement was: "It's fairly common in industries that employ populations they think they can take advantage of, like women or immigrants."
And the third statement also appeared in the press release. We conclude that all of these statements were opinions protected by the First Amendment. ¶ 72 Looking at the first statement, the employer asserts that the phrase "too cheap" was based on allegedly false factual assertions and implications of false facts. But we agree with the trial court that an allegation that a person or a business is "cheap" is not a factual assertion; rather, it is a subjective and often hyperbolic term. Because this statement was directly connected with allegations in the complaint in the federal lawsuit, we conclude that no reasonable listener would consider the use of the term "cheap" 506 P.3d 99 to be "anything but the opinion of the [speaker] drawn from the circumstances related" to the federal lawsuit. Chapin v. Knight-Ridder, Inc. , 993 F.2d 1087, 1093 (4th Cir. 1993) (deciding that the phrase "hefty mark-ups" was an expression of an opinion); Restatement (Second) of Torts § 566 cmts. b & c; see also Keohane , 882 P.2d at 1299 ; NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr. , 879 P.2d 6, 12 (Colo. 1994) (deciding that the description of a product as a "scam" was simply an expression of the speaker's "estimation of the worth of that product, and doing so in figurative and hyperbolic terms"). ¶ 73 The third statement, meanwhile, contains emotionally charged, potentially hyperbolic language: "exploiting women," "oppression of vulnerable workers," "too common," and "particularly audacious." These terms reflect "the sort of ‘imaginative expression’ and ‘rhetorical hyperbole’ the [United States] Supreme Court has regarded as particularly worthy of constitutional protection." Keohane , 882 P.2d at 1300 (quoting Milkovich , 497 U.S. at 20, 110 S.Ct. 2695 ). Like the first statement, Ms. Newman uttered the third statement in the context of the circumstances described in the federal lawsuit, see Chapin , 993 F.2d at 1093 ; Restatement (Second) of Torts § 566 cmts. b & c, so a reasonable person who heard these comments would not have taken them as assertions of fact. Instead, such a person would have instead viewed them as (1) Ms. Newman's "suspicions and conjecture" concerning the allegations in the federal lawsuit, see Keohane , 882 P.2d at 1301 ; or (2) her personal evaluation of the facts stated in the complaint and not as a claim based on knowledge that was otherwise unavailable to the listener, see id. ¶ 74 Turning to the fourth statement, the comments about the employer being part of an industry in which it is "fairly common" to "take advantage of" populations such as "women or immigrants" directly reflect allegations in the federal lawsuit. See Restatement (Second) of Torts § 566 cmts. b & c. A reasonable person would, therefore, understand these statements as either conjectural or as Ms. Newman's personal observations and comments on those allegations. See id. ; see also Keohane , 882 P.2d at 1299.
D. Summary Judgment
¶ 75 Before the trial court ruled on their motions to dismiss, the attorneys filed a motion alleging that they were entitled to summary judgment because their statements were true. The trial court did not rule on this motion, reasoning that it was moot because the court had granted the attorneys’ C.R.C.P. 12(b)(5) motion and dismissed the case. ¶ 76 Yet the attorneys now assert that we should grant the motion. We decline to do so because ruling on summary judgment motions in the first instance is the trial court's responsibility. See Colo. Pool Sys., Inc. v. Scottsdale Ins. Co. , 2012 COA 178, ¶ 51, 317 P.3d 1262 ("[T]he better practice on issues raised below but not ruled on by the district court is to leave the matter to the district court in the first instance." (quoting Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co. , 661 F.3d 1272, 1290 (10th Cir. 2011) )). Moreover, unlike our review of a motion to dismiss, the employer's response to the summary judgment motion suggests that there may be factual disputes that preclude summary judgment, and we leave those determinations to the trial court. See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc. , 2019 CO 51, ¶ 18, 442 P.3d 402 ("[T]rial courts make factual findings and appellate courts ‘pronounc[e]’ law. ... [I]f appellate courts were forced to take a fine-toothed comb to the factual disputes in each case, the appellate docket would ... suffer a major backlog.")(citation omitted).
¶ 77 We take no position on the merits of the attorneys’ summary judgment motion.
E. Attorney Fees ¶ 78 A party that successfully defends a trial court's decision to grant a C.R.C.P. 12(b) motion on appeal is entitled to recover reasonable attorney fees. State Farm Fire & Cas. Co. v. Weiss , 194 P.3d 1063, 1069 (Colo. App. 2008) ; see § 13-17-201, C.R.S. 2021 ("In all actions brought as a result of ... an injury to person ... occasioned by the 506 P.3d 100 tort of any other person," if the trial court dismisses the action "on motion of the defendant prior to trial under" C.R.C.P. 12(b), then the "defendant shall have judgment for his reasonable attorney fees in defending the action."). ¶ 79 The attorneys ask us to grant their request for attorney fees for defending the trial court's order. We decline this request because we are reversing the court's order dismissing this case and remanding the case for further proceedings.
IV. Conclusion
¶ 80 We affirm the trial court's determination that some of the statements that Ms. Newman made at the press conference — the second part of the first statement, the third statement, and the fourth statement — were opinions protected by the First Amendment.
¶ 81 We reverse the trial court's determination that the first part of Ms. Newman's first statement, her second statement, and one statement in the press release — "[The employer] forced [the nail] technicians to perform janitorial work without pay, refused to pay overtime, withheld tips, and shorted commissions" — were protected by the Noerr-Pennington doctrine, and we also conclude that those statements were not protected by the litigation privilege. As a result, we reverse the trial court's order dismissing this case.
¶ 82 We remand this case to the trial court to reinstate this case and to proceed accordingly.
JUDGE DUNN and JUDGE GROVE concur.